Unified Judicial System

 

 
 Estate of Florence Fischer, Deceased
Plaintiffs v.
Dean Fischer and Norma Fischer Husband and Wife
Defendants
Donald Fischer
Plantiff and Appellant,
v. 
Estate of Florence Fischer, Deceased
Defendant and Appellee.
Donald O. Fischer
Plantiff and Appellant,
v. 
Dean Fischer
Defendant and Appellee,
v. 
Joanita Kent-Montieth
Third-Party Defendant [2002 SD 62]
South Dakota Supreme Court
Appeal from the Circuit Court of The Fifth Judicial Circuit
Marshall County, South Dakota
Hon. Eugene E. Dobberpuhl, Judge
James M Cremer of Bantz, Gosch & Cremer, L.L.C Aberdeen, South Dakota
Attorneys for appellant Donald O. Fischer.
 
Lonald L. Gellhaus Jay R. Gellhaus of Gellhaus, Gerdes & Gellhaus, P.C. Aberdeen, South Dakota
Attorneys for appellee Dean Fischer.
 
Argued January 9, 2002
Opinion Filed 5/22/2002
#21958
 
GORS, Acting Justice
 
[Â¶1.] Donald Fisher (Donald) sued his brother Dean Fisher (Dean) alleging that Donald had a first-chance-to-buy land sold to Dean by John (Father) and Florence (Mother) Fisher (Parents) on a contract for deed.  The trial court held that Dean fulfilled the contract and that he was entitled to the land free and clear of any claims by Donald.  We affirm.
FACTS AND PROCEDURE
[Â¶2.] This is a land dispute between two brothers.  On January 15, 1976, Dean entered into a contract for deed with Parents to purchase four quarters of land near Britton, South Dakota.  Payments covered twenty years.  The contract stated the following:
It is understood by the parties that [Dean] is purchasing the real estate in question for the purpose of farming it; however, if [Dean] subsequently decides to quit farming, is incapacitated so he cannot farm said land, or becomes incompetent or predeceases [Parents] during the life of this contract, then it is agreed between the parties that Donald . . . shall have the first chance to buy the above-described property . . . .
 
The contract also stated that the land was to be conveyed to Dean by warranty deed, âfree and clear of all liens and encumbrancesâ upon payment.  Parents escrowed a warranty deed to be delivered to Dean upon payment of the contract.  The deed contained no restrictions.
[Â¶3.] In 1977, Dean married Joanita Kant Fisher (Joanita).  The contract for deed was modified to add Joanita as a party.  Father died in 1978 and his interest in the contract for deed passed to Mother.  In 1982, Dean and Joanita moved to Watertown.  Dean sold his machinery and cattle and rented the tillable land to Dalton Docter (Docter) and the pastureland to Hubert Dinger (Dinger).  Dean made payments to Mother until 1987. 
[Â¶4.] In the summer of 1985, Dean returned to Britton to work for Jarrett Farms.  Dean and Joanita divorced in 1986.  As part of the divorce, Joanita received one of the four quarters of land (Joanita Quarter) that was part of the contract for deed.  The divorce decree gave Dean the first right to purchase the Joanita Quarter if she decided to sell it.  Two years later, Joanita brought a quiet title action against Dean, Florence and Donald.  The quiet title was resolved by stipulation.  Joanita received clear title to her quarter of land.  Deanâs first right to purchase the Joanita Quarter continued in the event Joanita sold the land, and further provided that if Dean repurchased the land, Donaldâs first-chance-to-buy under the contract would also reattach.
[Â¶5.] Joanita rented her quarter until she decided to sell it to Donald in 1997.  Dean sued Joanita and Donald to exercise his first right to purchase.  The trial court entered a judgment giving Dean the right to purchase the Joanita Quarter by paying $88,000 by March 30, 1998.  Dean borrowed $90,000 from the Landreths, who are his neighbors, and paid Joanita.  Joanita executed a warranty deed conveying the land to Dean, free and clear of all encumbrances.  The deed was recorded.  Even though Dean now owned the land, Donald had leased it from Joanita for the 1998 crop-year and Dean was effectively excluded from the Joanita Quarter for the first year that he owned it.  Dean had the Joanita Quarter custom farmed by Peter Bremmon in 1999 and 2000.
[Â¶6.] Deanâs lease agreements with Docter and Dinger on the other three quarters of land expired in 1987.  Thereafter, Dean personally farmed the other three quarters of land.  In 1994, Dean began certifying these three quarters of land for organic farming.  The tillable acres of these three quarters became fully certified âorganicâ in 1998.  The organic certification was still in effect at the time of trial. 
[Â¶7.] Mother died in 1996.  The contract provided:
[I]f [Parents] die during the life of this Contract, then upon the demise of the latter of the two, [Dean] is to pay, or enter into a Contract to pay, [Donald] one-half of the remaining unpaid balance of this Contract for Deed due and owing at that time, after which this Contract will terminate and cease to exist and [Dean] will be entitled to have the Warranty Deed . . . delivered to him and to thereafter have clear and merchantable title. . . . 
 
Shortly after Motherâs death, Donald learned that Dean had been in default on the contract since 1987.  Donald began foreclosure on behalf of Motherâs estate in 1998.  In 1999, a judgment in the foreclosure action determined that the principal and interest due from Dean to redeem the contract totaled $188,025.20.  Therefore, under the terms of the contract, Dean owed Donald one half, which was $94,012.60.  Dean borrowed $186,500[1]  from Mark Hartinger, the stepson of one of the Landreths, and tendered the full payment of $190,322.70 into escrow on November 27, 1999, to payoff the contract.  Donald refused to authorize delivery of the warranty deed from escrow.  
[Â¶8.] The case was tried March 7-8, 2001.  The trial court found that Dean had fulfilled his part of the contract in November, 1999, when he had $190,322.70 placed in escrow to pay Donald.  The trial court also found that Deanâs payment of the contract terminated Donaldâs first-chance-to-buy the real estate.  The trial court held that Dean was entitled to receive the warranty deed held in escrow.  The trial court further found that Dean had not quit farming and did not sell the land during the life of the contract.
[Â¶9.] Donald appeals on the following issues:
1.       Whether Deanâs payoff of the contract terminated Donaldâs first-chance-to-buy.
 
 2.      Whether Dean quit farming within the life of the contract.
 
 3.      Whether the tender of payments stopped the interest from 
accruing.
 
STANDARD OF REVIEW
 
[Â¶10.] Our standard of review is well settled.  âWe will not set aside a trial courtâs findings of fact unless they are clearly erroneous.  A trial courtâs finding is clearly erroneous if, âafter reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made[.]ââ  In re Dokken, 2000 SD 9, Â¶10, 604 NW2d 487, 490 (internal citations omitted).  We review a trial courtâs conclusions of law under the de novo standard, giving no deference to the trial courtâs conclusions of law.  Osloond v. Osloond, 2000 SD 46, Â¶6, 609 NW2d 118, 121.  
ANALYSIS
[Â¶11.] 1.           Whether Deanâs payoff of the contract terminated 
Donaldâs first-chance-to-buy.
 
[Â¶12.] The dispute between Donald (age 71 in 2000) and Dean (age 60 in 2001) centers on the following provision in the contract:
If [Dean] subsequently decides to quit farming, is incapacitated so he cannot farm said land, or becomes incompetent or predeceases [Parents] during the life of this contract, then it is agreed between the parties that Donald . . . shall have the first chance to buy the above-described property . . . .
 
(emphasis added).  The contract is unambiguous.  The contract is not rendered ambiguous just because the parties do not agree on what it means.
A contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract.  Rather, a contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.  
 
Divich v. Divich, 2002 SD 24, Â¶10, 640 NW2d 758; (citing Singpiel v. Morris, 1998 SD 86, Â¶16, 582 NW2d 715, 719).  The contract provides that if Dean decides to quit farming, becomes incapacitated, incompetent, or predeceases his parents, then Donald shall have the first-chance-to-buy the property.  Donald argues that the phrase âduring the life of this contractâ only applies if Dean âpredeceases [Parents].â  Donald claims that even if Dean pays off the contract and then âsubsequently decides to quit farming,â Donald has the right to purchase the land.  Under this theory, Dean could never sell the property to anyone but Donald as long as Donald is alive.  We disagree.  
Doctrine of the Last Antecedent
[Â¶13.] In support of his position, Donald advances the âDoctrine of Last Antecedent,â which provides the following:
It is the general rule of statutory as well as grammatical construction that a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation.
 
Rogers v. Allied Mut. Ins. Co., 520 NW2d 614, 617 (SD 1994).  Donald urges us to construe the words âduring the life of this contractâ to modify only âpredeceases [Parents].â  Under Donaldâs argument, the phrase âdecides to quit farmingâ survives payoff of the contract and prevents delivery of the deed to Dean.  If the phrase âdecides to quit farmingâ survives payoff, Donald would continue to have a first-chance-to-buy the property as long as Donald lives.  To secure his first-chance-to-buy, Donald then makes the quantum leap in logic that he can order the escrow agent to retain possession of the warranty deed.
[Â¶14.] Essentially Donald argues that âduring the life of the contractâ would have to appear after each phrase in the list to modify anything more than the phrase âpredeceases [Parents].â  Carrying Donaldâs argument to its logical extreme, the paragraph would have to read as follows:
[I]f [Dean] subsequently decides to quit farming during the life of this contract, is incapacitated so he cannot farm said land during the life of this contract, or becomes incompetent during the life of this contract or predeceases [Parents] during the life of this contract, then it is agreed between the parties that Donald . . . shall have the first chance to buy the above-described property . . . . 
 
(emphasis added).  Donaldâs argument is wrong.  If Donald is correct, then the phrase âpredeceases [Parents] during the life of this contactâ would be meaningless because Dean predeceasing Parents is contained within each of the prior contingencies in the list.  For example, if Dean died, he would most certainly quit farming.  If Dean died, he would most certainly be incapacitated so he could not farm the land.  Finally, if Dean died, he would also become incompetent.  A contract should not be interpreted in a manner that renders a portion of it meaningless.  Bowen v. Monroe Guar. Ins. Co., 758 NE2d 976, 980 (Ind App 2001).  A more logical and less strained reading of the contract is that if any of the four conditions occur âduring the life of the contract,â then the first-chance-to-buy would be triggered.
Doctrine of Merger
[Â¶15.] The doctrine of merger provides âthat upon delivery and acceptance of an unambiguous deed, all prior negotiations and agreements are deemed merged within.â  Nelson v. Gregory County, 323 NW2d 139, 141 (SD 1982).  In Urquhart v. Teller, 958 P2d 714, 719 (Mont 1998), the Montana Supreme Court noted that, â[i]t is a general tenet of contract law that all provisions in a contract for sale of real property are merged into the deed.  Thus, when a deed has been executed, the purchaserâs rights are generally found in the deed covenants, not the executed contract.â (internal citations omitted).[2]         In this case the contract for deed was unambiguous, expressly stating that Dean was entitled to the escrowed warranty deed with âclear and merchantable titleâ when the contract for deed was paid.  The contract called for delivery of an unrestricted deed and the deed placed in escrow contained no restrictions.  Under the doctrine of merger, Donaldâs first-chance-to-buy under the contract did not survive Deanâs payoff of the contract.  
[Â¶16.] We also note that in general, âtitle to property under a deed deposited into escrow transfers when the escrow delivers the deed or when the conditions 
placed upon its delivery have been met.â  Hartman v. Wood, 436 NW2d 854, 856 (SD 1989) (citing 28 AmJur2d Escrow Â§ 29 (1966)  ).  A warranty deed, as required by law, is a conveyance in fee simple, free from all encumbrances.  SDCL 43-25-6.  Parentsâ warranty deed is a standard warranty deed, without any restrictions.  Dean met the conditions of the contract and therefore Dean should have complete ownership of the property without any liens or encumbrances.
[Â¶17.] If the doctrine of merger is not applied, once the contract is paid and the unrestricted warranty deed is recorded, a subsequent purchaser would not have adequate notice of the first-chance-to-buy lurking in the contract for deed.  Under Donaldâs view that the contract is not merged into the deed, purchasers and abstractors would be required to examine every contract for deed in every chain of title--even if it was followed by an unrestricted warranty deed.  A search disclosing vague conditions would then require speculation whether the conditions survive payoff of the contract and recording of the warranty deed.  If Donaldâs argument is correct, Donaldâs first-chance-to-buy could only be cleared from the title by obtaining a quit claim deed from Donald that expressly relinquished his first-chance-to-buy, or, in the event of Donaldâs death, by filing proof that Donald was dead to establish that his first-chance-to-buy had expired with him.
Agreement to Agree 
[Â¶18.] Donaldâs first-chance-to-buy provided in the contract for deed reads as follows:
Donald O. Fisher . . . shall have the first chance to buy the above-described property, at a price to be agreed upon between the said Dean D. Fisher and Donald Fisher[.] 
 
(emphasis added).  This provision is an agreement for one of the parties to agree with someone who is not a party to the contract.  â[A]n agreement to agree does not fix an enforceable obligation.  It is indefinite, vague, and uncertain.  An agreement must be sufficiently definite to enable a court to give it an exact meaning.â  Deadwood Lodge No. 508, Etc. v. Albert, 319 NW2d 823, 826 (SD 1982).  Therefore, even if the first-chance-to-buy applied forever, as Donald would have us hold, it is unenforceable because the trial court could not force Donald and Dean to agree on a price and it is not the function of the trial court to fix the price for the parties.  Engle v. Heier, 84 SD 535, 537, 173 NW2d 454, 456 (1970).
Drafting
[Â¶19.] If Parents had intended to give Donald a first-chance-to-buy after payoff of the contract for deed, careful drafting could have avoided this case.  Donald conceded at oral argument that the unrestricted warranty deed is not consistent with his position that the first-chance-to-buy survives payoff of the contract for deed.  If Parents wanted Donaldâs first-chance-to-buy to survive payoff of the contract for deed, then the warranty deed could simply have stated that the conveyance was subject to Donaldâs first-chance-to-buy as set forth in the contract for deed dated January 15, 1976, and recorded in the office of the Marshall County Register of Deeds, followed by the recording information.
[Â¶20.] 2.        Whether Dean quit farming within the life of the 
contract.
 
[Â¶21.] Donald argues that even if Deanâs payoff of the contract extinguished Donaldâs first-chance-to-buy, Dean quit farming prior to the payoff of the contract, thereby triggering Donaldâs first-chance-to-buy.
[Â¶22.] Dean moved to Watertown and rented his land to his neighbors from 1982-1987.  During those years, Mother made no objections and continued to accept Deanâs payments.  The trial court found that Motherâs conduct condoned a broad interpretation of the word âfarming.â  We agree.  Blackâs Law Dictionary defines âfarmâ as â[t]o lease or let; to demise or grant for a limited term and at a stated rental.  To carry on business or occupation of farming.â  Blackâs Law Dictionary 606 (6th ed 1990).  In this case, renting the land is sufficient to constitute farming.  Donald conceded at oral argument that Deanâs rental of the land to Docter and Dinger from 1982 to 1987 is not the basis for his argument that Dean quit farming.
[Â¶23.] Instead, Donald claims that Dean quit farming the Joanita Quarter when he hired Peter Bremmon to custom farm the Joanita Quarter in 1999 and 2000.  Bremmon also custom farmed the Landrethsâ land for them.  Dean signed over the proceeds from the crops grown on the Joanita Quarter directly to the Landreths.  Donald claims that Dean had actually sold the Joanita Quarter to the Landreths and thereby quit farming it.  Donald points out that the Landreths told their bank that they were buying the Joanita Quarter.  However, Dean borrowed $90,000 at 9% interest by signing a note to the Landreths when he bought back the Joanita Quarter from his ex-wife.  Dean testified he was simply repaying part of the loan by turning the proceeds from the crops grown on the land directly over to the Landreths.
[Â¶24.] Dean had a valid reason to have the Joanita Quarter custom farmed.  Deanâs other three quarters of land were certified organic.  The Joanita Quarter was not.  If Dean used his machinery to farm the Joanita Quarter, then his machinery would be contaminated and he would lose his organic certification.  Faced with the choice of contaminating his equipment and losing his organic certification on three quarters of land or hiring a custom farmer, Deanâs decision to hire someone to work the Joanita Quarter seems prudent.  We agree with the trial court that Dean did not âquit farmingâ by hiring Peter Bremmon to farm the Joanita Quarter.
[Â¶25.] While it is undisputed that Dean personally farmed the other three quarters organically in both 1999 and 2000, Donald still argues that Dean quit farming these three quarters when he borrowed the money from Mark Hartinger to redeem them.  Hartinger is a stepson of one of the Landrethâs.  Donald claims that the loan from Hartinger to redeem the land is really a purchase because Hartinger also told his banker he was buying the land.    While Dean signed a note and a mortgage to secure the loan from Hartinger and the Landreths, there is no conveyance, only innuendo.  What the Landreths intended, anticipated or said to their bankers is irrelevant.  While there is an implication that Dean might sell the land to the Landreths in the future, the trial court found that there was no evidence that Dean actually sold[3]  the property to Landreths and also found that Dean was not bound by representations that the Landreths made to other people.  We agree.
[Â¶26.] Part of the reason Dean resorted to the Landreths for help was Donaldâs conduct.  First, Donald tried to buy the Joanita Quarter out from under Dean.  Second, Donaldâs 1998 crop-year lease from Joanita excluded Dean from the Joanita Quarter after he bought and paid for it in 1998.  Third, through litigation, Donald has cast a cloud on Deanâs title to the Joanita Quarter, which prevented him from obtaining conventional financing to payoff the Landreths.  Fourth, Donald has persistently refused to deliver the warranty deed for the other three quarters of land in spite of Deanâs payment of the entire amount owing on the contract, which has also prevented Dean from obtaining conventional financing.  Dean turned to the Landreths because of Donaldâs litigation and delays.
[Â¶27.] 3.        Whether the tender of payment stops the interest from 
accruing.
 
[Â¶28.] Donald argues that Deanâs payoff of the contract was conditioned on obtaining a deed from Donald, and that this condition does not stop the accrual of interest.  We disagree.  SDCL 20-5-18 provides in pertinent part: 
An offer of payment or other performance, duly made, though the title to the thing offered be not transferred to the creditor, stops the running of the interest on the obligation . . . .  
 
(emphasis added).  Donald argues that he had a right to test the validity of his claim and that interest should continue to accrue during this time.  This argument fails.  The trial court held, and we agree that upon Deanâs tender of the full payment he was entitled to a warranty deed free and clear of any claims or conditions.  Pursuant to SDCL 20-5-18, even if title is not immediately transferred, tender of payment stops the accrual of interest.  Dean is not required to pay interest on the contract for deed while Donald takes him to court.  We agree with the trial court and hold that no further interest is owing.
CONCLUSION
[Â¶29.] Dean fulfilled the contract for deed on November 7, 1999, by paying $190,322.70 into escrow.  Further, Dean did not quit farming and he did not sell the land.  Dean owes no further interest on the contract for deed.  The warranty deed should be delivered to Dean.  
[Â¶30.] Affirmed.
[Â¶31.] AMUNDSON and KONENKAMP, Justices, concur.
[Â¶32.] GILBERTSON, Chief Justice, and SABERS, Justice, dissent.
[Â¶33.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.
 
GILBERTSON, Chief Justice (dissenting).
[Â¶34.] I respectfully dissent.  In doing so, I take at face value the description in Dean's own brief of his occupational endeavors from 1982 to 1987:
In 1982, Dean and Joanita M. Kant Fisher decided to move to Watertown, South Dakota.  Dean sold his machinery and cattle and rented the real estate that is the subject of the Contract for Deed and Supplemental Agreement concerning Contract for Deed.  The tillable land was rented to Dalton Docter and the pastureland was rented to Hubert Dinger for approximately six years, during 1982 through 1987.
 
Thereafter, as the majority opinion acknowledges, Donald hired Peter Bremmon to farm the Joanita Quarter in 1999 and 2000 and the Landreths apparently controlled the balance of the land that Bremmon also custom farmed.  Thus, a history is clearly established as to Dean's lack of direct contact with the farm after 1982.
[Â¶35.] In 1974, two years prior to the signing of the contract for deed, the Legislature enacted a statutory definition of "farming."  See 1974 SD SessL ch 294, 
Â§ 3(4).  Although the provision deals with corporate farming, it establishes a clear legislative determination that farming and ownership of farmland are not synonymous.  SDCL 47-9A-2(4) defines "farming" in relevant part to be:  "the cultivation of land for the production of agricultural crops; livestock or livestock products; poultry or poultry products; milk or dairy products; or fruit or other horticultural products."  See also SDCL 47-9A-3 (distinguishing between farming and the ownership of farmland).  
[Â¶36.] This statutory definition is in line with prior case law that defines farming as the tillage of soil or the cultivation of land.  Sohner v. Mason, 288 P2d 616, 617 (CalDistCtApp 1955).  "[T]he dominant and distinguishing characteristic of [farming] in both the popular and the legal sense of the term, is the cultivation of the soil for the production of crops therefrom."  Chudnov v. Bd. of Appeals of Town of Bloomfield, 154 A 161, 162 (Conn 1931).
[Â¶37.] The overly expansive definition of farming from Black's Law Dictionary, relied upon by the majority, is at odds with the above authority.  Under that definition, anyone other than Dean who owned the property from 1982 to 1987 and rented it out to the same tenants would have been classified as a "farmer."  This Black's definition converting landowners into farmers has been specifically rejected by the United States Court of Appeals for the Eighth Circuit.  See In re Easton, 883 F2d 630, 634 (8thCir 1989) (stating "we reject the proposition .  .  . that the renting out of land simpliciter constitutes 'farming[.]'").
[Â¶38.] Definitions aside, the language of the contract for deed itself provides ample support for the view that, to fulfill its terms, Dean was required to personally farm the property.  "In determining the proper interpretation of a contract, a court is to seek to ascertain and give effect to the intention of the parties."  Kimball Inv. Land, Ltd. v. Chmela, 2000 SD 6, Â¶14, 604 NW2d 289, 293.  In that endeavor, a court, "'must consider the entire contract.'"  Hayes v. N. Hills Gen. Hosp., 1999 SD 28, Â¶62, 590 NW2d 243, 254 (quoting S & S Trucking v. Whitewood Motors, Inc., 346 NW2d 297, 299 (SD 1984)).  "A contract is to be examined and read in its entirety with all provisions being read together to construe its meaning."  Friesz ex rel Friesz v. Farm & City Ins., 2000 SD 152, Â¶10, 619 NW2d 677, 680.  Here, in the very same sentence of the contract stating its purpose was for Dean to farm the property, was a clause providing that if he became incapacitated to a degree "he" (i.e., Dean) could not farm the land, then Donald would have the first chance to buy it.  The obvious intention of these two clauses when read together was that Dean would personally farm the property.  Were the intention that Dean could fulfill the contract by renting or leasing the property, there would be no need for a clause addressing his incapacity, because an incapacitated person can rent or lease property just as easily as a healthy person.  Clearly the provision was not intended to deal with Dean's mental incapacity, as there is a separate clause addressing that eventuality.  
[Â¶39.] In conclusion, I would hold that Dean quit farming in 1982.  There is no provision in the contract that permitted Dean to "unring the bell" and cut off Donald's rights by restarting farming thereafter.  The intention of the contract was to keep the farm in the family as a family farm, not as an investment for an absentee landlord in Watertown.  There is no basis in the contract from which we can conclude that Donald's rights should indefinitely be put on hold as long as Dean retains ownership of the land and mulls over his future options, which may or may not ever include personally farming the land. 
[Â¶40.] I respectfully dissent and further join the dissent of Justice Sabers.
 
SABERS, Justice (dissenting).
 
[Â¶41.] I dissent.  The majority opinion goes out of its way to frustrate the intent of the parents to keep the farm in the family. 
[Â¶42.] The contract for deed (CFD) provided in part:
It is understood by the parties that [Dean] is purchasing the real estate in question for the purpose of farming it; however, if [Dean] subsequently decides to quit farming, is incapacitated so he cannot farm said land, or becomes incompetent or predeceases [parents] during the life of this contract, then it is agreed between the parties that [Donald] . . . shall have the first chance to buy the above-described property[.]
 
(emphasis added).  
[Â¶43.] The majority opinion unduly exaggerates Donaldâs alleged admission at oral argument.  Donaldâs counsel simply stated at oral argument that the provisions of  
the warranty deed [were not] consistent with the contract for deed . . . although thatâs what was intended by the parties.  And now thereâs a judge saying that the warranty deed trumps the contract for deed and I think that is wrong.  
 
The intent of the parents was to keep the farm in the family and not allow it to be sold by Dean to anyone other than Donald or another family member. 
[Â¶44.] John and Florence Fisherâs conduct expressed their intent to keep the farm in the family.  Johnâs will provided that âit is also my wish and I so direct that if Dean desires to sell the real estate that is the subject of the Contract for Deed, that my son, Donald O. Fisher, have the first right to purchase[.]â  Florenceâs will provided that âif my son, Dean D. Fisher . . . ever desires to sell the farm real property . . . my elder son, Donald O. Fisher, shall have the first right to purchase the property[.]â  The will also provided that the right of purchase would extend to Donaldâs children.
[Â¶45.] Because the parents intended for the farm to stay in the family, Deanâs purported payoff of the balance due under the CFD did not extinguish Donaldâs right to purchase.  This is especially so because Deanâs payoff of the CFD resulted from the violation of the provision providing Donald the first right of purchase.  In other words, the majority opinion is allowing Dean to violate the CFD provisions and Donaldâs first right of purchase as long as he pays off the CFD with the proceeds of the purchase.  Nonsense.  The CFD does not give Dean the right to sell the land to a stranger to finance the payoff because the sale is in violation of Donaldâs first right of purchase.  One should not get the benefit of ending âthe life of the contractâ by violating it.
[Â¶46.] In addition, Donald should have had the opportunity to buy the land when Dean quit farming.  The majority opinion states that ârenting the land is sufficient to constitute farming.â  While this statement may be true under some circumstances, it is not true under these circumstances.  Dean moved to Watertown in 1982, sold all of his farming equipment, and ârentedâ the land to his neighbors from 1982-1987.  Clearly, he decided to quit farming.  Even after he returned to Marshall County, he continued to ârentâ the land to others.  
[Â¶47.] In fact, Dean did more than rent the land to others, he sold it to others.  Here, Dean quit farming, quit paying on the CFD and sold the land to Landreths in violation of his parentsâ intent and condition.  Because of financial difficulties, he was delinquent in his payments on the contract for deed.  To avoid a foreclosure action on his interest in the CFD, Dean essentially sold the land to his neighbors, the Landreths, who arranged for or did all of the farming and received all the profits.  Deanâs actions are inconsistent with an intent to farm the land.  Therefore, Donaldâs right to purchase the land was triggered when Dean quit farming and upon the sale of the land to the Landreths.  
[Â¶48.] The trial court erred in its determination that, once Dean paid Donald the balance due under the CFD, Donald had âno further rights, title, encumbrance, or interest [in] the real estate set forth in the Contract for Deed whatsoever[.]â  As stated:  One should not get the benefit of ending âthe life of the contractâ by violating it.
[Â¶49.] I would reverse and remand for further proceedings consistent with this writing.
 

[1] .       Dean paid the full amount to redeem the contract but would later receive one half back as his share of Motherâs estate.

[2] .       This Court has previously held that we will apply the doctrine of merger subject to exceptions.  Nelson, 323 NW2d at 142.  The exceptions are fraud or mistake or the existence of collateral contractual provisions or agreements that are not intended to be merged into the deed.  Id.  None of the exceptions apply in this case.

[3] .       In any event, selling the land is a red herring.  Dean could sell some or all of the land without deciding to âquit farming.â  Farming does not require ownership of this land or any land.  Sharecroppers and renters are still farmers.  All Dean has to do to avoid the contractual trigger of Donaldâs first-chance-to-buy, is to never decide to quit farming.  Stated in the positive, Dean would only need to decide to continue farming, even if he farmed some other land, to satisfy the contract.  Donald wants the court to read terms into the contract that are not present.  Donald wants the contract to say âif [Dean] subsequently decides to quit farming this land,â then Donald has the first-chance-to-buy.