#28927-r-PJD
**2020 S.D. 33**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

TERRY HANNA and
RHONDA HANNA,                                Plaintiffs and Appellants,

    v.

WILLIAM LANDSMAN,                            Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
DEUEL COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT L. SPEARS
Judge

* * * *

GARY W. SCHUMACHER
TODD D. WILKINSON of
Wilkinson & Schumacher Law, Prof. LLC
De Smet, South Dakota                        Attorneys for plaintiffs
                       and appellants.


JENNIFER GOLDAMMER
DONALD McCARTY of
Helsper, McCarty & Rasmussen, P.C.
Brookings, South Dakota                      Attorneys for defendant
                       and appellee.

* * * *

CONSIDERED ON BRIEFS
SEPTEMBER 30, 2019
OPINION FILED **06/17/20**

#28927

DEVANEY, Justice

[¶1.] In this breach of contract case, the circuit court granted summary judgment to the defendant, concluding that the alleged agreement relating to the transfer of real property was unenforceable because it was for an unlawful purpose, lacked consideration, and violated the statute of frauds. The plaintiff appeals, and we reverse and remand.

## Factual and Procedural Background

[¶2.] Terry Hanna owned a trucking business and farmland in Deuel County. In 2000, he experienced financial difficulties and enlisted the help of Bill Landsman, a longtime acquaintance experienced in assisting individuals with debt settlement and restructuring. Landsman and Hanna dispute what transpired after Landsman began helping Hanna. However, we relate the evidence in a light most favorable to Hanna, the party against whom summary judgment was granted.

[¶3.] Landsman holds a real estate license and operates Landsman Realty. He also worked as a financial agricultural counselor for the State on a contract basis. In his role as an agricultural counselor, Landsman would assist individuals in financial distress and mediate disputes between the individuals and their lenders. Although Landsman was not hired to be Hanna's counselor in an official capacity, it is undisputed that he advised Hanna on his finances and negotiated reduced settlements for Hanna on various debt obligations. He also loaned Hanna money to assist with Hanna's financial situation. Landsman characterized his role with Hanna as "his banker, per se" and explained that he came up with a plan for Hanna to deal with his debt without going through bankruptcy.

[¶4.] This appeal concerns 240 acres (the property) in Deuel County owned by Hanna since 1985 and encumbered by a mortgage with First National Bank in Brookings for approximately $260,000. Hanna's home and shop for his trucking business are located on the property. According to Hanna, Landsman orchestrated a multi-step plan for Hanna to sell the property to Landsman so that Hanna could satisfy his mortgage, but also so that Hanna could make payments toward regaining ownership while he continued to reside on the property and operate his trucking business.

[¶5.] The record reflects that one of Hanna's debts included federal payroll taxes he failed to remit from the tax period ending June 30, 1999 to the tax period ending June 30, 2002. He testified that his now ex-wife had been his bookkeeper and that he did not learn that his taxes were unpaid until their divorce. While Landsman was assisting Hanna with his debt restructuring, Landsman learned that the IRS had told Hanna that it would be filing liens for the unpaid taxes totaling $359,593. After learning this, Landsman and Hanna executed Landsman's multi-step plan concerning the transfer of Hanna's property.

[¶6.] To execute the plan, Landsman asked Midwest R & S Corporation to purchase the property from Hanna and thereafter sell it to him (Landsman). According to Landsman, Midwest was owned by Robert Fishback who also owned First National Bank in Brookings, the bank holding the mortgage on Hanna's property. Although Landsman was *not* a shareholder, Landsman related that Midwest was a company in which he would invest money, and Midwest would in turn invest Landsman's money in real estate. Landsman testified that he and

Fishback had frequently, and for many years, done business together. At the time Landsman arranged for Midwest to purchase Hanna's property, Landsman had an existing cash investment at Midwest, on which Midwest was paying interest to.

[¶7.]     On October 7, 2000, Hanna and Midwest executed a purchase agreement for Midwest to buy the property (including the land, buildings, truck shop, fences, dugout, and six semi-trailers) for $183,000. Hanna and Fishback signed the agreement, and Landsman also signed, but as the seller's broker and agent.

[¶8.]     The record also contains a "COMMENT SHEET" for "William Landsman" created by Midwest. The October 10, 2000 entry related the following:

> Today Bill Landsman was in to get $500 from Midwest to purchase some farm real estate from Terry Hanna. This transaction was approved by Tom and Bob.
>
> Instead of Bill purchasing the property himself, Midwest is going to purchase it for now. It will be in turn purchased by Bill. Tom has required a 25% down payment and the rate will be 9.5%.
>
> Midwest will have title to the property for now but a purchase agreement should be prepared between Midwest and Bill to protect both parties. A loan was prepared for now between Midwest and Bill.
>
> The final closing is expected to happen on the 20th. Advanced $182,933.14  24th.

The closing occurred on October 23, 2000, when Hanna executed a warranty deed conveying the land to Midwest. Landsman notarized the deed. The closing statement provides that the selling price was $183,000, that Hanna paid off his existing note on the property for $146,023.43, and that $30,889.66 was due to the

seller at closing.[1]  Hanna signed the closing statement, and Landsman signed as Hanna's broker.  The purchase agreement and warranty deed were filed on October 24, 2000.

[¶9.]        Also on October 24, 2000, Midwest and Landsman executed a purchase agreement whereby Midwest agreed to sell Landsman the same 240 acres (including the land, buildings, truck shop, fences, dugout, and six semi-trailers) for $183,000.  The agreement required Landsman to pay Midwest $46,183.15 on October 27, 2000 and the balance by January 2, 2003.  The agreement further indicated that "any payment made to Midwest would be subtracted from the balance of the principal."

[¶10.]       Two other documents were executed on October 24, 2000—a lease agreement and an option agreement.  They purport to be agreements between Hanna and Midwest; however, it appears from the record that they were drafted by Landsman.  The lease agreement listed Hanna as the tenant and Midwest as the landlord and indicated that the property to be leased included the building site, truck garage, and 15 of the 240 acres Hanna had just sold.  The lease term was two years, and Hanna was to pay $550 per month in rent starting in November 2000.

---

1.    Landsman explained that the bank holding the existing note on this property was either First National or First Bank & Trust, which he referred to as "Fishback's bank."  Landsman agreed with counsel's characterization that Fishback got involved in the transaction because "his bank [had] a loan with Terry, and then [Fishback was] using his separate company [Midwest] to do this land restructuring."

Hanna signed the agreement, and Landsman signed as follows: "Midwest R & S

Corporation by W.M. Landsman."[2]

[¶11.] The option agreement is entitled as an agreement between "Terry L.

Hanna and Midwest R & S Corporation *by W.M. Landsman*." (Emphasis added.)

The option agreement provided a property description and the following options and

terms:

> I, Terry Hanna may buy all the land buildings back before December 31, 2001 for the purchase price, expenses and 5% of the purchase price of $183,000.00
> or
> Terry Hanna may buy all the land and buildings back before December 31, 2002 for the purchase price, expenses, and 10% of the purchase price of $183,000.00
> also
> Teery [sic] Hanna must pay monthly payments of 550.00. Payments are due to Midwest R & S, %[sic]First National Bank, Brooking, SD on the first of each month. Payments will be determined by what the taxes are. $1000 per year for up-keep on the property, insurance on the buildings, interest and principal on the land of $183,000 plus 9.5% interest and 30 year amortization.
> or
> Terry Hanna may purchase the house acreage for $65,000 plus expenses any time up to December 31, 2002.
> or
> The truck acreage for $20,000 plus expenses up to December 31, 2000.
> The acreage and truck acreage may be purchased separately.
> The 6 trailers and the semi tractor that are on the purchase agreement revert to Terry Hanna at closing of property on October 24, 2000.

---

2. While in his appellate brief, Landsman asserts that he was not a party to the lease or option agreements signed by Midwest and Hanna, Landsman testified that the plan had always been that he (Landsman) was going to purchase the property. Moreover, because Landsman simultaneously purchased this property from Midwest at the time the option agreement was entered into, he was an indispensable or, at the very least, a necessary party thereto.

> Note: Terry Hanna knows he may loose [sic] all of the land and buildings, if the payments are not made on time.
>
> Terry Hanna also knows W.M. Landsman is going through Midwest R & S Corporation as the lender and W.M. Landsman is a Licensed Real Estate Agent.

Hanna signed this document, but it does not contain a signature of either Landsman or Fishback.

[¶12.]    In November 2000, after these transactions, the IRS filed multiple tax liens which generally attached to "all property and rights to property belonging to" Hanna.  The liens identify the last date each lien could be refiled, which varied between November 2009 and October 2012.  It is not clear what amount, if any, Hanna paid toward these liens.  He testified that he did make some payments on the tax debt, but he also testified that he did not pay off the liens and that they were ultimately released because of the passage of time.  Hanna asserted that the tax debt was "settled," pointing to the IRS release forms containing language stating that the taxes have been satisfied.  Both Landsman and Hanna testified that an IRS representative indicated that the IRS would not attempt to enforce the liens and would allow Hanna to continue in his trucking business so long as Hanna remained current on his taxes.

[¶13.]    After Hanna, Midwest, and Landsman executed their respective agreements related to the property, Landsman and Hanna separately issued payments to Midwest, though the reason for these payments is not apparent from the transaction documents.  Midwest's Comment Sheet reflects that Midwest applied these payments to Landsman's note: "Today $46,183.15 was posted as a

#28927

principal reduction on MW#62457. WM Landsman #18639 for $15,750.00 & Terry Hanna #5028 for $30,433.15." However, there is no record of a new mortgage being placed on the property securing Landsman's note. Nevertheless, the purchase agreement between Landsman and Midwest sets forth a $183,000 purchase price, with $46,183.15 to be paid on October 27, 2000, and the balance of $137,250 to be paid by January 2, 2003. It further provides that "any payment made to Midwest will be subtracted from balance of principal."

[¶14.]        Midwest's Comment Sheet reflects that Hanna paid $550 for rent in December 2000. The Comment Sheet also identifies that two additional tenants leased portions of the 240-acre parcel and paid rent to Midwest, and that the rent payments were being deposited in Landsman's savings account and then posted to the outstanding loan (sometimes referred to as a "note"). The Comment Sheet relates one additional reference to Hanna's rent obligation, stating that Landsman had called Midwest indicating that Hanna's January 2002 rental payment was "waived due to some improvements." Although the Comment Sheet does not identify additional rental payments by Hanna, it is undisputed that despite the expiration of the two-year lease, Hanna remained on the property at the time of this suit.

[¶15.]        Other than the rent payments from Hanna and the farm tenants, there are no additional indications in Midwest's Comment Sheet that any other payments were being made or posted on this loan. The interest rate of the loan was modified at least three times, and the loan's maturity date was extended seven times at Landsman's request. The last entry in the Comment Sheet lists a maturity date of

"12/31/11." Thus, it appears the loan was still outstanding when a warranty deed was issued from Midwest to Landsman in October 2007 after Landsman requested that Midwest transfer title because he wanted to lease the property to a company building wind towers. Landsman indicated that he would continue putting the cash rent payments toward the loan and property taxes.

[¶16.] With regard to the options set forth in the October 24, 2000 agreement between Hanna and Midwest, Hanna testified that he never directly advised Midwest that he was exercising any of the options because "Bill [Landsman] did everything for [him]." He further claimed that he believed that "they already knew" it was his intention to repurchase the land. Hanna explained that he or his wife Rhonda would call Landsman periodically to ask what amount was left to pay on this loan (as well as the loans related to the trucking business). Landsman does not dispute that these communications occurred. Rhonda testified that during one particular call, she had asked Landsman for the amount Hanna still owed on the farm, and Landsman told her $56,600. The record contains a check from Rhonda dated August 16, 2010, payable to Landsman in the amount of $56,600, with "farm" written on the memo line. Hanna maintained that this check was the final payment, after which he specifically asked Landsman to transfer back the 240 acres but Landsman refused to transfer title of the property.

[¶17.] In October 2013, Hanna and his wife brought suit against Landsman for breach of contract, along with additional causes of action not relevant to this

appeal.[3] Landsman answered, denying that he had any agreement with Hanna regarding the property. He also counterclaimed, asserting causes of action not relevant to this appeal. Because this appeal concerns only the disputed 240 acres, we relate the procedural history relevant to that claim.

[¶18.] Hanna and Landsman filed cross-motions for partial summary judgment. Hanna asserted that there are no disputed material facts as to the question whether Landsman had agreed to convey the property back to him after any debt remaining on the property was paid in full, or as to whether he had in fact paid off his debt to Landsman under that agreement. In response and in support of his cross-motion, Landsman asserted that no such agreement existed, oral or otherwise. Alternatively, Landsman asserted that if an agreement existed, Hanna's claim was barred by the statute of frauds, that the agreement was invalid because it was for an unlawful purpose (to defraud the IRS), that the agreement failed for lack of consideration, and that Hanna failed to perform.

[¶19.] After a hearing and post-hearing briefing, the circuit court entered a memorandum decision granting Landsman's summary judgment motion and denying Hanna's. The circuit court identified the elements necessary to create a

---

3. Hanna's second claim alleged another breach of contract pertaining to a different real estate parcel in which Hanna had an interest that was also transferred to Landsman. The parties reached a settlement as to this claim. Hanna's third claim alleged breach of contract and fraud pertaining to a leasing company created by Landsman to assist Hanna in restructuring debt related to his trucking business. Landsman counterclaimed for unjust enrichment based upon Hanna receiving a benefit from Landsman's debt settlement services without paying for such. These claims were presented to a jury. The jury returned verdicts for both parties, but awarded zero damages.

contract and concluded that the agreement was unlawful because "the only reason the farmland was transferred out of Hanna's ownership was to defraud the IRS." Alternatively, the court reasoned that even if the agreement was for a lawful purpose, Hanna's contract claim is barred by the statute of frauds and would fail for lack of consideration. The court did not address Landsman's alternative argument that Hanna failed to perform. The court also declined to consider the doctrines of promissory estoppel or part performance as asserted by Hanna because of the court's determination that the contract concerned an unlawful object or purpose.

[¶20.] Hanna appeals, asserting the circuit court erred in granting summary judgment on Hanna's breach of contract claim.

## Standard of Review

[¶21.] Our standard of review from a summary judgment is well settled:

> In reviewing a grant or a denial of summary judgment under SDCL 15-5-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*Millard v. City of Sioux Falls*, 1999 S.D. 18, ¶ 8, 589 N.W.2d 217, 218 (quoting *Walther v. KPKA Meadowlands Ltd. P'ship*, 1998 S.D. 78, ¶ 14, 581 N.W.2d 527, 531).

## Analysis and Decision

*Whether an Enforceable Contract Exists*

[¶22.] Hanna contends the circuit court erred in concluding as a matter of law that any agreement alleged by Hanna for the return of the property at issue fails to satisfy the statute of frauds. Hanna contends that there are material issues of fact in dispute to support that he and Landsman "entered into an agreement pursuant to which [Landsman] agreed to secure financing to pay off [Hanna's] existing loans on certain real property"; that Hanna would, under this agreement, transfer title to the 240 acres to Landsman; and that Landsman would "reconvey title" to Hanna "at such time as [Hanna] repaid all loan funds and interest." Hanna then claims that he presented evidence to support that he "made numerous payments from October 2000 until the final payment on" August 16, 2010.

[¶23.] Hanna does not contend that one written document embodies the essential elements of the above agreement. Rather, he claims that three written agreements construed together establish a contract sufficient to satisfy the statute of frauds. He directs this Court to his farm lease and option agreement and the purchase agreement between Landsman and Midwest. He highlights that each of these written contracts "has a lawful object and sufficient consideration[.]" He also emphasizes that Landsman orchestrated the multi-step plan and drafted and signed the relevant documents.

[¶24.] The "[e]lements essential to existence of a contract are: (1) [p]arties capable of contracting; (2) [t]heir consent; (3) [a] lawful object; and (4) [s]ufficient cause or consideration." SDCL 53-1-2. An agreement for the sale of real estate or

an interest therein must be in writing to be enforceable. SDCL 53-8-2(3). *In re Matheny Family Tr.*, 2015 S.D. 5, ¶ 11, 859 N.W.2d 609, 612. The writing relied upon does not have to "embody the exact terms of the contract; 'it is sufficient that the substance of a contract for the purchase of real property is inferred from the writing[.]'" *Wiggins v. Shewmake*, 374 N.W.2d 111, 114 (S.D. 1985) (quoting *Drake v. Sample*, 279 N.W.2d 685, 689 (S.D. 1979)). "To satisfy the statute of frauds, a memorandum for the sale of land must describe the land, the price, and the contracting parties; it need not detail the form or delivery of deed, the time and place of payment, or any other matters." *Amdahl v. Lowe*, 471 N.W.2d 770, 774–75 (S.D. 1991).

[¶25.]     From our review, the three writings relied upon by Hanna and Midwest's Comment Sheet—when construed together—establish the description of the land, the purchase price, and the contracting parties. *See Wiggins*, 374 N.W.2d at 115 (To satisfy the statute of frauds "the writings may consist of disjointed memoranda or protracted correspondence."). The documents identify the property to be conveyed—the 240 acres previously owned by Hanna. The documents further identify the subscribing parties to this three-way transaction: Hanna, Landsman, and Midwest. Finally, the various writings also establish a price term of $183,000 plus interest. Therefore, we conclude that these writings sufficiently set forth the substance of the parties' agreement to satisfy the statute of frauds and the circuit court erred in concluding otherwise.

[¶26.]     Landsman nevertheless asserts that even if the parties' writings satisfy the statute of frauds, the option agreement set forth various deadlines by

which Hanna had to perform. The option agreement also contained the note: "Terry Hanna knows he may loose [sic] all of the land and buildings, if the payments are not made on time." Hanna, on the other hand, contends that Landsman "agreed to reconvey title to said real property to [Hanna] *at such time* as [Hanna] repaid all loan funds and interest." (Emphasis added.) According to Hanna, he and Landsman had agreed that so long as he continued to make payments on the property and ultimately paid off the outstanding balance on Landsman's loan from Midwest, he could buy back the property. Hanna further claims that he made additional payments based upon these promises and representations by Landsman. This dispute regarding the time and manner of performance involves matters outside the scope of a statute of frauds defense.

[¶27.] "Although the statute of frauds prohibits oral alteration of a written contract for the sale of land, a waiver of the time for performance is not an alteration of a written contract." *Johnson v. Sellers*, 2011 S.D. 24, ¶ 16, 798 N.W.2d 690, 695 (citing *Endres v. Warriner*, 307 N.W.2d 146, 149 (S.D. 1981)). In *Johnson*, we held "that notwithstanding the statute of frauds, parties may orally waive conditions involving the performance of the contract[,]" including the time of payment. *Id.* ¶ 17. *See also Hofeldt v. Mehling*, 2003 S.D. 25, ¶ 11, 658 N.W.2d 783, 787 (The parol evidence "rule does not apply to conduct and statements taking place *after* a contract agreement has been executed." (Emphasis added.)).

[¶28.]     We further noted, in *Endres*, that the doctrine of estoppel "is closely akin to waiver."[4]  307 N.W.2d at 150.  The doctrine of promissory estoppel requires proof of an unfulfilled oral promise relied upon to the detriment of the promisee.  *Vander Heide v. Boke Ranch, Inc.*, 2007 S.D. 69, ¶ 27, 736 N.W.2d 824, 834.  "To apply the doctrine of promissory estoppel, the trial court must [also] find: 1) the detriment suffered in reliance must be substantial in an economic sense; 2) the loss to the promisee must have been foreseeable by the promisor; and 3) the promisee must have acted reasonably in justifiable reliance on the promise made."  *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 848 (S.D. 1990).

[¶29.]     From our review of the record, Hanna has identified sufficient material facts in dispute on the question whether the identified writings contemplated a later time for performance, or whether Landsman, by subsequent representations or conduct, agreed to waive or extend the time for performance and Hanna thereafter relied and acted upon such representations to his detriment.  It is undisputed that Landsman orchestrated a multi-step plan under which Hanna would transfer ownership of the property to Landsman through the use of a third-party intermediary, Midwest.  Further, the parties' testimony supports that the three-party transaction was structured, at Landsman's suggestion, as a sale-leaseback

---

4.     Even when writings are insufficient to satisfy the statute of frauds, we have applied the doctrine of promissory estoppel to enforce an oral promise to convey real property.  *See, e.g., Durkee v. Van Well*, 2002 S.D. 150, ¶ 21, 654 N.W.2d 807, 814–15, *abrogated on other grounds by Mundhenke v. Holm*, 2010 S.D. 67, 787 N.W.2d 302; *Hahne v. Burr*, 2005 S.D. 108, ¶ 10, 705 N.W.2d 867, 871.

agreement to satisfy Hanna's existing mortgage, with Hanna retaining the ability to repurchase the property, and Midwest acting as the lender.[5]

[¶30.]    Hanna offered evidence that he relied on Landsman's representations when he conveyed the property to Midwest (the initial buyer), but then immediately paid Midwest $30,433.15 (a portion of Hanna's proceeds from the sale). This sum was applied toward Landsman's $46,183.15 down payment to Midwest to fund Landsman's simultaneous purchase of the property. Notably, nothing on the face of the parties' written agreements required Hanna to make such a payment.

[¶31.]    Hanna also submitted evidence to support his assertion that after transferring the property, he made payments to reacquire it. There is no dispute Hanna remained in possession of the property after his two-year lease expired, despite the fact that he did not continue to make monthly lease payments. A note in Midwest's Comment Sheet indicates that at least one rent payment was waived due to improvements Hanna made to the property. The Comment Sheet also reflects the parties' agreement to directly apply Hanna's rental payments, along

---

5.    Landsman argues that Hanna is precluded by the doctrine of merger from undoing "the transfer of real estate that was conveyed by warranty deed many years ago." "The doctrine of merger provides 'that upon delivery and acceptance of an unambiguous deed, all prior negotiations and agreements are deemed merged within.'" *Estate of Fisher v. Fisher*, 2002 S.D. 62, ¶ 15, 645 N.W.2d 841, 846 (citation omitted). Here, Hanna does not seek to undo his conveyance of the property by warranty deed to Midwest, or Midwest's conveyance of the deed to Landsman. Rather, Hanna seeks to enforce an alleged agreement he had with Landsman under which Landsman would convey ownership of the property back to him after Hanna made payment in full on Landsman's loan from Midwest. *See, e.g.*, *Nelson v. Gregory County*, 323 N.W.2d 139, 142 (S.D. 1982) (noting that an exception to the doctrine of merger is "the existence of collateral contractual provisions or agreements which are not intended to be merged in the deed").

with the third-party tenants' rental payments, toward the outstanding balance of the loan Landsman obtained from Midwest to fund the remainder of the purchase price Landsman had agreed to pay for this property. Finally, Rhonda testified that long after the option agreement's purported expiration date of December 31, 2002, the Hannas paid what Landsman indicated, and they believed, to be the final amount due ($56,600) on their agreement to reacquire the property.[6] Because there are material issues of fact in dispute on Hanna's contract and alternative estoppel claims, the circuit court erred in granting summary judgment.

*Whether an Unlawful Object Precludes Enforcement of the Contract*

[¶32.]    In addition to granting summary judgment on the basis that Hanna's alleged contract fails under the statute of frauds, the circuit court determined that one of the essential elements of a contract is absent, in particular, the requirement

---

6.    The option agreement includes language that could be construed to support Hanna's claimed oral agreement as to his time for performance, namely that so long as he made timely payments, he would maintain the ability to regain ownership of the 240 acres. The third paragraph prefaced by "also" provides that "Hanna must pay monthly payments of $550." While this sentence appears to refer to Hanna's $550 monthly payment on the *two-year* lease of a *portion* of the property, this paragraph includes the following additional language: "Payments will be determined by what the taxes are. $1,000 per year for up-keep on the property, insurance on the buildings, interest and principal on the land of $183,000 plus 9.5% interest and 30 year amortization." Notably, none of this additional language is contained in the separate lease agreement, and the $183,000 refers to the purchase price for the *whole acreage*, rather than just the smaller building site Hanna was leasing. Moreover, the 9.5% interest rate is consistent with the rate applied to Landsman's note with Midwest, and Hanna testified that he believed he was paying off Landsman's loan under what he deemed to be a 30-year mortgage. There is ambiguity, therefore, in the language of this particular paragraph and how it relates to the other provisions in this option agreement.

of a lawful object. The court found that based upon the facts presented, "the only reason the farmland was transferred out of Hanna's ownership was to defraud the IRS." The court, therefore, concluded that the contract has "an unlawful purpose, object or subject matter" and is "unenforceable as a matter of law."[7]

[¶33.]     On appeal, Hanna argues that the circuit court erred in reaching this conclusion. He notes that each of the written documents executed by the parties has a lawful object and sufficient consideration. He also highlights that the IRS did not give notice of its liens until November 29, 2000, after the property had already been transferred. Hanna further claims that he "reached an agreement with the IRS regarding his unpaid 941 taxes and he made payments to the IRS to satisfy this agreement."

[¶34.]     Under SDCL 53-1-2(3), a lawful object is essential to the existence of a contract. *See Knecht v. Evridge*, 2020 S.D. 9, ¶ 47, 940 N.W.2d 318, 331. The object of the contract is defined as "the thing which it is agreed, on the part of the party receiving the consideration, to do or not to do." SDCL 53-5-1. "Where a contract has but a single object and such object is unlawful in whole or in part, . . . the entire contract is void." SDCL 53-5-3. Therefore, when a contract is void, it "is invalid or unlawful from its inception. It is a 'mere nullity, and incapable of confirmation or ratification.'" *Nature's 10 Jewelers v. Gunderson*, 2002 S.D. 80, ¶ 12, 648 N.W.2d

---

7.     The circuit court cited 26 U.S.C.A. § 7206 in support of its determination that the alleged agreement is unenforceable. Under subsection (4) of this statute, "[a]ny person who . . . [r]emoves, deposits, or conceals, or is concerned in removing, depositing, or concealing . . . any property upon which levy is authorized by section 6331, with intent to evade or defeat the assessment or collection of any tax imposed by this title . . . shall be guilty of a felony[.]" *Id.*

804, 807 (citation omitted). However, "[w]here a contract has several distinct objects, one or more of which are lawful and one or more of which are unlawful in whole or in part, the contract is void as to the latter and valid as to the rest." SDCL 53-5-4.

[¶35.]     Importantly, there is nothing unlawful on the face the parties' agreement. Hanna sold his property to a third party for good and valuable consideration and entered into a simultaneous agreement allowing him to buy the property back over time. In declaring the contract unenforceable, the circuit court did not consider the lawful objectives asserted by the parties. Instead, the court referred to certain portions of the parties' deposition testimony and concluded that defrauding the IRS was the *only* purpose for the alleged agreement.

[¶36.]     However, the evidence in the record reveals that whether Hanna transferred this property with the intent to defraud the IRS is disputed. Under the option agreement, had Hanna exercised either option of buying the property back by December 31, 2001 or 2002, he would have owned the property before the IRS liens were released and the IRS could then have executed on this property to satisfy the liens. In addition, Landsman and Hanna testified that they met with IRS representatives and were informed that the IRS would not proceed against its liens so long as Hanna stayed current on his taxes. Hanna testified that his plan was to make monthly payments to the IRS to pay off the debt, and while he agreed that he did not pay off the liens, he testified that the debt was "settled." Hanna points to the language in the Certificates of Release filed by the IRS stating that the IRS has "satisfied the taxes listed" and "all statutory additions." In the same vein, during

his deposition testimony, Landsman denied that the initial land transfers were undertaken to avoid the IRS debt. Landsman explained that the purpose of the underlying land transactions was to help Hanna restructure his debt and avoid bankruptcy.

[¶37.] From our review of the record and the court's decision, the circuit court appears to have disregarded much of this evidence. It is also evident that the court weighed the evidence when it entered findings of fact on what it regarded as "facts that exist without *substantial* controversy." (Emphasis added.) "The judge's function at the summary judgment stage, however, is not to weigh the evidence and determine the matters' truth." *Hamilton v. Sommers*, 2014 S.D. 76, ¶ 42, 855 N.W.2d 855, 868. Moreover, on summary judgment, the evidence must be viewed in a light most favorable to the nonmoving party (Hanna). *See Millard*, 1999 S.D. 18, ¶ 8, 589 N.W.2d at 218. Therefore, the circuit court erred when it summarily concluded that the only reason Hanna transferred the property was to *defraud* the IRS.

[¶38.] Landsman argues—for the first time on appeal—that summary judgment was nevertheless proper because the doctrine of *in pari delicto* bars Hanna from using the court "to effectuate illegal oral agreements."[8] Notably, the remedy resulting from a determination that a contract is without a lawful purpose is the same as when parties are found to have been acting *in pari delicto*—the contract cannot be enforced, either because it is void from the outset in the case of

---

8. Landsman asserted the similar doctrine of unclean hands in his argument to the circuit court.

an unlawful purpose, or because the court cannot, by enforcing the contract, "do something that is itself part of the unlawful act." *Cowan Bros., LLC v. American State Bank*, 2007 S.D. 131, ¶ 23, 743 N.W.2d 411, 419 (quoting *Katun Corp. v. Clarke*, 484 F.3d 972, 978 (8th Cir. 2007)). However, the *in pari delicto* doctrine is distinct from the question whether a contract has an unlawful purpose. Our case law has made clear that the application of "the *in pari delicto* doctrine is only appropriate where the parties acted in concert or conspired to commit a wrong." *See id.* ¶ 24; *accord Quick v. Samp*, 2005 S.D. 60, ¶ 8, 697 N.W.2d 741, 745; *Massey Ferguson Credit Corp. v. Bice*, 450 N.W.2d 435, 440 (S.D. 1990). Therefore, to apply this doctrine, the court must find that Hanna and Landsman were *mutually involved in the wrongdoing. See Cowan Bros.*, 2007 S.D. 131, ¶ 23, 743 N.W.2d at 419 (citation omitted).

[¶39.] "The doctrine of *in pari delicto* is 'based on judicial reluctance to intervene in disputes'" where mutual wrongdoing has occurred. *Id.* ¶ 23 (quoting *Katun*, 484 F.3d at 978). In *Massey Ferguson*, we applied this doctrine in declining to enforce an agreement between two parties (Bice and Nelson) to a retail installment contract who acted in concert to defraud a credit company (MF Credit) by seeking financing for a nonexistent tractor. 450 N.W.2d at 439 (referring to the policy where a court leaves "all equally culpable parties . . . in the position in which they have placed themselves").[9] The circuit court had summarily dismissed Bice's

---

9. In *Massey Ferguson*, the circuit court denied relief to Bice who sought indemnification from Nelson (an implement dealer) because the requested relief arose out of their agreement to defraud MF Credit. 450 N.W.2d at 437. Nelson and Bice had entered into a series of retail installment agreements

(continued . . .)

third-party complaint seeking indemnity from Nelson, concluding Bice and Nelson acted *in pari delicto* in perpetrating the fraud.  We upheld the dismissal on appeal as a matter of public policy and law, concluding that "[t]he uncontested facts show that Bice was an active party in carrying out and concealing the fraud from MF Credit." *Id.* at 440.

[¶40.]        Unlike the undisputedly fraudulent contract in *Massey Ferguson*, material issues of fact are in dispute as to the intentions of Hanna and Landsman when entering into the land transactions at issue here.  Moreover, in *Quick*, we noted an exception to the doctrine of *in pari delicto* "when denying relief would offend public morals to a greater extent than granting relief."  2005 S.D. 60, ¶ 9, 697 N.W.2d at 745 (citing *Gaines v. Wolcott*, 167 S.E.2d 366, 370 (Ga. Ct. App. 1969)).  As one court noted, "[a]s a general rule . . . forfeitures by operation of law are disfavored, particularly where a defaulting party seeks to raise illegality as 'a sword for personal gain rather than a shield for the public good.'" *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 603 N.E.2d 246, 248 (N.Y. 1992) (citation omitted).  This is especially true when "there are regulatory sanctions and statutory penalties in place to redress violations of the law." *Id.*

---

(. . . continued)

financed by MF Credit, one of which involved Nelson selling Bice a nonexistent tractor and assigning the contract to MF Credit for immediate cash.  Nelson's implement dealership was in financial trouble at the time, and he agreed to provide Bice the money to make payments on the illusory contract with MF Credit.  However, Nelson did not advance Bice the money as agreed.  Bice later defaulted on the contract with MF Credit.  When MF Credit brought suit against Bice, he claimed that Nelson should be held liable to MF Credit and filed a third-party complaint for indemnification.

[¶41.]     Therefore, the circuit court improperly granted summary judgment on this issue.  If, on remand, the object of the contract remains a disputed issue, the finder of fact must first identify, after weighing the evidence, the object or objects of the transactions at issue and whether any such objects are unlawful.  If the circuit court is asked to apply the equitable doctrine of *in pari delicto* or any of its exceptions, the factfinder must also determine whether both Hanna and Landsman were engaged in wrongdoing.

*Lack of Consideration*

[¶42.]     In granting summary judgment, the circuit court also found a lack of consideration to support the alleged contract.  The court rejected the following consideration asserted by Hanna: (1) "that the cash rent paid by the tenants, other than [Hanna], would be applied somehow to the purchase price of the land"; and (2) "that the rent [Hanna] was paying on his residence in the amount of $550 per month should have been applied to the purchase price of the 240 acres of farmland." According to the court, neither of these assertions established consideration because they rested on the performance of preexisting obligations.

[¶43.]     Under SDCL 53-6-1, "[a]ny benefit conferred or agreed to be conferred upon the promiser by any other person to which the promiser is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer as an inducement to the promiser, is a good consideration for a promise."  However, "performance of a pre-existing duty cannot form the basis for valid consideration for a contract." *Prairie Hills Water and Develop. Co. v. Gross*, 2002 S.D. 133, ¶ 43, 653 N.W.2d 745,

755 (citing *Garrett*, 459 N.W.2d at 841; *Dawson v. Corbett*, 71 S.D. 106, 21 N.W.2d 758 (1946)).

[¶44.]      The rent payments by the farm tenants were made pursuant to the tenants' rental agreements with Midwest, and therefore could not form the basis for valid consideration under the agreement alleged by Hanna.  However, the same may not be true for Hanna's payments, because there is a factual dispute over whether Hanna was paying solely rent, or rather paying off Landsman's loan.  The record reflects that Hanna issued at least two payments ($30,433.15 on October 24, 2000 and $56,600 on August 16, 2010) toward his asserted agreement whereby Landsman would transfer title after Landsman's loan from Midwest was paid in full.  Neither of these payments were required under the terms of the option agreement or the separately executed lease agreement.  Therefore, while these payments may not establish that Hanna has paid in full under the terms of his asserted agreement, they are sufficient to refute Landman's argument that the alleged agreement fails as a matter of law for lack of consideration.

[¶45.]      We reverse the circuit court's grant of summary judgment and remand for further proceedings.

[¶46.]      GILBERTSON, Chief Justice, and KERN, JENSEN, and SALTER, Justices, concur.