#29249-aff in pt & rev in pt-PJD
**2021 S.D. 44**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

NICHOLE A. BOGGS,                                          Plaintiff and Appellee,

    v.

ANDREW PEARSON, MARK
TOLAND, MARTIN HOFFMAN,
Individually, and the CITY OF
SIOUX FALLS, SOUTH DAKOTA,
a political subdivision acting by and
through the SIOUX FALLS POLICE
DEPARTMENT,                                          Defendants and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE DOUGLAS E. HOFFMAN
Judge

\* \* \* \*

JEFFREY R. BECK
Sioux Falls, South Dakota                    Attorney for plaintiff and
                                             appellee.


GARY P. THIMSEN
ALEXIS A. WARNER of
Woods, Fuller, Shultz, & Smith, P.C.
Sioux Falls, South Dakota                    Attorneys for defendants and
                                             appellants.

\* \* \* \*

ARGUED
NOVEMBER 17, 2020
OPINION FILED **07/28/21**

#29249

DEVANEY, Justice

[¶1.]     In this 42 U.S.C. § 1983 action against certain officers of the Sioux Falls Police Department and the City of Sioux Falls, the circuit court concluded on a motion for summary judgment that the officers were not entitled to qualified immunity because material issues of fact were in dispute on the questions whether the officers' warrantless entry into the plaintiff's apartment and subsequent use of force were constitutional.  The court further denied summary judgment on the plaintiff's claim against the City, determining that material issues of fact were in dispute as to whether the plaintiff's injury was caused by inadequate training, a deliberate indifference, or an errant policy.  We affirm in part, reverse in part, and remand.

**Factual and Procedural Background**

[¶2.]     Around 3:15 a.m. on August 19, 2016, Sioux Falls police officers Mark Toland and Andrew Pearson were dispatched to investigate a 911 call.  Dispatch was able to determine that the call came from a location within a 25-meter radius of 4513 East Ashbury Place in Sioux Falls, which is an apartment building within a large apartment complex.  The caller was not identified, but the line remained open and the dispatcher documented what was heard.  Between 3:18:54 a.m. and 3:31:38 a.m., the dispatch log relates the following: "hear alot of verbal discussion . . . hear a dog barking"; "and female saying no alot"; heard someone asking "if calling police"; "only verbal . . [.] hear some swearing . . . and people saying knock it off . . . and someone saying no"; "heard again did you guys call the cops"; "can hear a female

-1-

telling him t[o] sit down . . [.] and will get his stuff"; "fairly calm . . [.] but can still hear alot of talking . . [.] sounds like several people there[.]"

[¶3.]    Officer Toland arrived at the apartment complex at approximately 3:19 a.m.  He relates in his affidavit that he observed a man sitting outside and asked him if he had heard anything.  The male pointed the officer to the apartment complex at 4517 East Ashbury Place and told the officer that people were fighting.  While the man explained this, Officer Toland heard a male yell.  Officer Toland walked toward the apartment building and found an adult male standing outside one of the apartments.  The male, Brendan Conlon, told Officer Toland that he and his brother had gotten into an argument and one of their dogs had bitten him.

[¶4.]    Thereafter, Brendan and Officer Toland walked to the ground-level apartment leased by Brendan's mother, Nichole Boggs.  As they approached the apartment, Officer Toland observed blood on the concrete near Nichole's apartment.  Brendan knocked on the door, and Nichole answered.  Nichole told the officer that she wanted Brendan to leave, and she threw his shoes in front of the door.  Nichole explained that she wanted Brendan gone because he and her other son Cody had gotten into a physical fight over Brendan falling asleep while leaving food cooking on the stove.  She stated that the fight took place outside the apartment.  Officer Toland told Nichole there had been a 911 call and that the police department's policy required him to enter her apartment to ensure no one was injured, but she refused to allow him to enter without a warrant.

[¶5.]    While Officer Toland was talking to Nichole, her adult son Sebastian came to the door from inside the apartment.  Sebastian also told Officer Toland that

he could not enter the apartment without a warrant. At some point, Nichole stepped outside of the apartment and went to her garage to get a folder containing documents pertaining to her legal rights. When she returned, she told Officer Toland he could not enter her home. According to Officer Toland, he repeated to Nichole for a third time that he needed to enter the apartment to make sure everyone was okay. He claimed he also told her if she did not let him go in, she could be arrested for obstruction.

[¶6.]     Officer Pearson then arrived on the scene, and he, along with Officer Toland, again told Nichole that they needed to enter her apartment. Officer Pearson, like Officer Toland, had noticed blood on the concrete near Nichole's apartment. Officer Pearson states in his affidavit that when questioned about the blood, Brendan indicated it was his and again claimed he had been bitten by the family dog. Brendan lifted his shirt and showed him a small laceration on his upper abdomen. Officer Pearson's affidavit also states that when he arrived, all three individuals (Nichole, Brendan, and Sebastian) were agitated and denied the officers entrance into the apartment without a warrant, informing them that everyone inside the apartment was fine. Officer Pearson further claims that when Sebastian attempted to shut the apartment door, Officer Toland placed his foot in the way to prevent the door from closing. According to Officer Pearson, this made Nichole, Brendan, and Sebastian "increasingly agitated."

[¶7.]     Three other individuals then came to the door from inside the apartment and were later identified as Nichole's sons Cody and Jaden and a family friend. According to Officer Toland, the boys told the officers that there was no one

else in the apartment. While the door to the apartment was open, Officer Pearson observed a fresh laceration on Cody's face. According to Nichole, the officers ordered all the occupants out of the apartment. Both officers relate in their affidavits that at some point, Cody, age 17, attempted to push past the officers to reenter the apartment. Officer Toland stopped Cody from reentering by putting his hand on Cody's chest, after which Cody, Brendan, and Sebastian began yelling and became increasingly confrontational. Thereafter, the officers placed Cody, Brendan, and Sebastian in handcuffs.

[¶8.]    While the boys were in handcuffs outside the apartment, Nichole continued to insist that no one from her apartment had called 911. She further claims in her affidavit that although she had asked the officers to attempt to determine the source of the 911 call, they made no attempt to communicate with dispatch in order to identify the caller. The officers dispute this claim and note in their affidavits that the dispatch log showed attempted communications between dispatch and officers responding to the scene regarding the identity and location of the caller.[1]

[¶9.]    Neither Officer Toland nor Officer Pearson placed Nichole in handcuffs throughout the encounter, and they allowed her to move around freely outside the apartment. Nichole went to her garage a second time to retrieve legal papers, and when she returned with papers in hand, the officers told her they were going to enter her apartment without her consent. Approximately 20 minutes had elapsed

---

1.    An entry in the dispatch log states, "Facebook shows the number belongs to Boggs, Cody."

since the 911 call, and by this time, several additional officers had arrived to help secure the scene, including Sergeant Martin Hoffman.

[¶10.] Officer Toland entered the apartment first, and Nichole followed behind while flipping through the papers she had retrieved from her garage. Officer Pearson entered behind Nichole and, according to Nichole, without any verbal command or warning, grabbed her left arm and began to throw her to the ground. Officer Toland turned around and attempted to grab her right arm. Nichole claims in her affidavit that when Officer Pearson threw her to the ground, her head and face struck the entryway floor, causing her severe pain.

[¶11.] The officers' version of this encounter is quite different. Officer Pearson's affidavit states that as the officers were walking into the apartment, Nichole started following them, and he instructed her to wait outside. He further claims that when Nichole stated she was going inside, he attempted to "re-direct" her outside, but she pushed past him. According to Officer Pearson, he then grabbed Nichole's left arm while Officer Toland grabbed her right arm. Both officers explain in their affidavits that as Officer Toland was grabbing Nichole's arm, he fell backward and landed on the ground. Officer Pearson claims that at the time these events were occurring, he thought Officer Toland was taking Nichole to the ground, rather than just falling, so he (Officer Pearson) "guided" her to the ground. Officer Pearson's affidavit further states that while everyone was on the ground, Nichole was actively resisting arrest and attempting to get her hands free.

[¶12.] Eventually, the officers, along with assistance from Sergeant Hoffman, placed Nichole in handcuffs, and Officer Pearson took her out to his patrol vehicle.

They also called paramedics to assess her injuries. Meanwhile, Officer Toland and Sergeant Hoffman searched the apartment and did not find any additional occupants. While Nichole did not receive any treatment from the paramedics, she later claimed that she suffered a fractured arm and dislocated shoulder because of the officers' actions.

[¶13.] Nichole was arrested and charged with obstruction and resisting arrest, Sebastian was arrested for disorderly conduct, and Brendan was arrested for disorderly conduct and simple assault. A jury later acquitted Nichole and Sebastian on all counts, and the charges against Brendan were dismissed prior to trial.

[¶14.] After the incident, Sergeant Hoffman investigated the officers' use of force. According to Nichole, when Sergeant Hoffman spoke with her at the jail, he told her that the situation should not have happened. Both Sergeant Hoffman and Nichole agree that he took pictures of her injuries, but according to Sergeant Hoffman, the photos were not useable because the card in the camera was corrupted. As part of his investigation, the sergeant also reviewed the audio recordings from the officers' body microphones. The recordings are not in the record, but according to the parties, in one of the recordings, Officer Pearson can be heard asking Officer Toland whether Nichole had pushed or touched him causing him to fall, and Officer Toland can be heard denying that Nichole had touched him, stating that he had simply lost his balance. Sergeant Hoffman ultimately concluded that the officers' use of force complied with the department's policies.

[¶15.] In February 2017, Nichole gave the City of Sioux Falls notice of her claim for injuries arising out of the incident on August 19, 2016. Thereafter, on

July 8, 2018, she filed an action under 42 U.S.C. § 1983 against Officer Toland, Officer Pearson, and Sergeant Hoffman in their individual capacities for their violation of her constitutional rights, and a § 1983 action against the City of Sioux Falls for negligent training, hiring, and supervision. She is seeking compensation for the damages she suffered because of the officers' unconstitutional entry into her apartment and excessive use of force to detain her.

[¶16.] The defendants (the officers, the sergeant, and the City) filed a motion for summary judgment. They claimed that Nichole's § 1983 claim against them is barred by the doctrine of qualified immunity because their actions were justified, and their use of force was objectively reasonable as a matter of law in light of the undisputed facts. The defendants likewise asserted that summary judgment is proper as to Nichole's claim against the City because no individual officer violated Nichole's constitutional rights, and even if one had, Nichole has not identified an official municipal policy or custom responsible for causing the constitutional violation or injury.

[¶17.] Nichole filed a cross-motion for summary judgment, requesting that the court find the defendants liable as a matter of law. She alleged that no material issue of fact was in dispute regarding whether the officers violated her clearly established constitutional rights to be free from unreasonable searches and from the use of excessive force. She further claimed that in light of the egregious nature of the officers' actions, the City's custom or policy necessarily caused her injury, making the City liable as a matter of law.

[¶18.] After a hearing, the circuit court issued a memorandum decision and order denying both parties' summary judgment motions. The defendants petitioned this Court to allow an appeal from the circuit court's intermediate order, which we granted pursuant to SDCL 15-26A-3(6). On appeal, the defendants claim that the circuit court erred in denying summary judgment on Nichole's § 1983 claims.

## Standard of Review

[¶19.] Under our well-established standard:

> In reviewing a grant or a denial of summary judgment under SDCL 15-5-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*Hanna v. Landsman*, 2020 S.D. 33, ¶ 21, 945 N.W.2d 534, 541 (quoting *Millard v. City of Sioux Falls*, 1999 S.D. 18, ¶ 8, 589 N.W.2d 217, 218).

## Analysis and Decision

[¶20.] "Under the Civil Rights Act of 1871 (42 U.S.C. § 1983) a party may recover damages for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States caused by any person acting under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.'" *Swedlund v. Foster*, 2003 S.D. 8, ¶ 15, 657 N.W.2d 39, 46 (quoting *Tri Cnty. Landfill Ass'n, Inc. v. Brule Cnty.*, 2000 S.D. 148, ¶ 11, 619 N.W.2d 663, 667).

Therefore, "[a] state official may be held personally liable under § 1983 for actions taken in his or her official capacity which violate constitutional rights." *Hafner v. Delano*, 520 N.W.2d 587, 591 (S.D. 1994).

[¶21.] However, government officials may raise the defense of qualified immunity under certain scenarios. *Swedlund*, 2003 S.D. 8, ¶ 16, 657 N.W.2d at 46. "Qualified immunity shields a government official from liability and the burdens of litigation in a § 1983 action for damages unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known." *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011); *accord Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009); *Thornton v. City of Rapid City*, 2005 S.D. 15, ¶ 10, 692 N.W.2d 525, 530. When qualified immunity is raised as a defense, a court must evaluate whether (1) the facts as alleged or shown by the plaintiff "make out a violation of a constitutional right"; and if so, (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232, 129 S. Ct. at 816. Courts have discretion to address either prong first because both prongs must be satisfied to avoid summary judgment. *Id.* at 236, 129 S. Ct. at 818.

[¶22.] The defendants assert they are entitled to qualified immunity as a matter of law for their warrantless entry into Nichole's apartment and subsequent use of force to detain her, and therefore, the circuit court erred in denying them summary judgment. Because Nichole's § 1983 claims implicate two separate violations of her constitutional rights, we address each alleged violation in turn.

*Warrantless Entry into the Apartment*

[¶23.]     The United States Constitution and the South Dakota Constitution guarantee the right of the people to be free from unreasonable searches and seizures.  U.S. Const. amend. IV; S.D. Const. art. VI, § 11.  A warrantless search is "per se unreasonable, apart from a few, well-delineated exceptions."  *State v. Rolfe*, 2018 S.D. 86, ¶ 12, 921 N.W.2d 706, 710 (quoting *State v. Fierro*, 2014 S.D. 62, ¶ 15, 853 N.W.2d 235, 240).  The State has the burden of proving that the search falls within an exception to the warrant requirement.  *Id.*  Here, in support of the officers' warrantless entry into Nichole's apartment, the defendants rely on two exceptions previously applied by this Court: the emergency aid doctrine and the community caretaker doctrine.

[¶24.]     Under our precedent existing at the time of the incident in question, to invoke the emergency (or emergency aid) doctrine exception: "(1) there must be grounds to believe that some kind of emergency exists that would lead a reasonable officer to act; and (2) the officer must be able to point to specific and articulable facts, which if taken together with rational inferences, reasonably warrant the intrusion."  *State v. Deneui*, 2009 S.D. 99, ¶ 27, 775 N.W.2d 221, 234; *see id.* ¶ 32, 775 N.W.2d at 235 (noting no useful distinction between emergency doctrine and emergency aid doctrine).  In *Deneui*, we also recognized the community caretaker exception, which overlaps in part with the emergency aid doctrine.  To invoke the community caretaker exception: "the purpose of community caretaking must be the objectively reasonable independent and substantial justification for the intrusion; the police action must be apart from the detection, investigation, or acquisition of

criminal evidence; and the officer should be able to articulate specific facts that, taken with rational inferences, reasonably warrant the intrusion." *Id.* ¶ 41, 775 N.W.2d at 239. The community caretaker exception does not contemplate "actual emergencies"; rather, it "is more akin to a health and safety check." *Id.*

[¶25.]　　　　After this case was submitted to the Court in November 2020, the United States Supreme Court issued two decisions rejecting the application of a freestanding "community caretaking exception" to the warrantless entry of a home. *See Caniglia v. Strom*, ___ U.S. ____, 141 S. Ct. 1596, 209 L. Ed. 2d 604 (2021); *Sanders v. United States*, ___ U.S. ___, 141 S. Ct. 1646, ___ L. Ed. 2d ___ (2021). In *Caniglia*, the Court noted that it "has repeatedly 'declined to expand the scope of . . . exceptions to the warrant requirement to permit warrantless entry into the home.'" ___ U.S. at ____, 141 S. Ct. at 1600 (citation omitted). It explained that the "recognition that police officers perform many civic tasks in modern society [is] just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere." *Id.* While the Court reaffirmed existing exceptions to the warrant requirement "when certain exigent circumstances exist, including the need to 'render emergency assistance to an injured occupant or to protect an occupant from imminent injury[,]'" the Court concluded that the "community caretaking" rule applied by the First Circuit went "beyond anything this Court has recognized." *Id.* ___ U.S. at ___, 141 S. Ct. at 1599. Relying on *Caniglia*, the Court thereafter vacated the Eighth Circuit's application of the community caretaking doctrine in *Sanders*, ___ U.S. ___, 141 S. Ct. 1646 (involving a 911 call reporting a domestic disturbance).

[¶26.] Although our prior recognition and application in *Deneui* of a freestanding community caretaking exception to the warrantless entry of a home may no longer withstand Fourth Amendment scrutiny given *Caniglia* and *Sanders*, the question at issue in *this* appeal is whether the officers are entitled to qualified immunity as a matter of law for their warrantless entry into Nichole's apartment based on clearly established law *at the time of the entry*. *See Pearson*, 555 U.S. at 244, 129 S. Ct. at 823 (reviewing the law in effect at the time of the officers' conduct). Therefore, neither *Caniglia* nor *Sanders* controls, and instead, *Deneui* guides our decision.

[¶27.] "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*, ___ U.S. ___, ___, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011)). The "legal principle must have a sufficiently clear foundation in then-existing precedent." *Id.* In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 438 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987). Our "precedent must have placed the statutory or constitutional question beyond debate" under the circumstances the officers confronted. *See al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083. This does not mean we "require a case directly on point," *see id.*, but "the unlawfulness" of the officer's conduct "must be apparent" from the "pre-existing

law[,]" *see Anderson*, 483 U.S. at 640, 107 S. Ct. at 3039. *See also Ziglar v. Abbasi*, ___ U.S. ___, 137 S. Ct. 1843, 1867, 198 L. Ed. 2d 290 (2017).

[¶28.] The parties dispute whether there was an emergency or a substantial justification for the warrantless intrusion into Nichole's apartment under either the emergency aid doctrine or the community caretaking exception. However, when reviewing the denial of the officers' motion for summary judgment, we accept the facts in a light most favorable to Nichole. *See Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 1774–75, 167 L. Ed. 2d 686 (2007) (explaining that, when considering a defendant's summary judgment motion, the plaintiff's version of the facts is usually adopted). Viewed in that light, the facts known to law enforcement on the scene do not suggest that it would have been clear to any reasonable officer, under existing precedent, that entering Nichole's apartment without a warrant to make sure there was no one inside in need of assistance would be unlawful.

[¶29.] The officers responded to an open-line, 911 call reporting a fight within the area of Nichole's apartment complex. After arriving at the scene, the officers confirmed that a fight had occurred between at least two of the residents of the apartment, and in addition to observing a small amount of blood on the concrete outside the entryway to the apartment, they also observed small lacerations on Brendan and Cody. While Nichole and her sons insisted that no one was inside the apartment in need of aid, the 911 call, the report of a fight, and the observable injuries on two of the occupants could raise reasonable concerns for the officers that someone inside may need assistance.

[¶30.] In recognizing the community caretaker exception which, as defined in *Deneui*, covers a more expansive category of circumstances than the emergency aid doctrine, we noted that "a merely officious concern that someone might conceivably need assistance to avert some undefined peril should not justify police intrusion into a private dwelling." 2009 S.D. 99, ¶ 42, 775 N.W.2d at 239. But we further noted that "police officers fulfill a vital role where no other government official can[,]" *see id.* ¶ 49, 775 N.W.2d at 242, and thus, "police officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions[,]'" *see id.* (quoting *Winters v. Adams*, 254 F.3d 758, 763 (8th Cir. 2001)) (noting the role of police officers as "first responders to the sick and injured," "interveners in domestic disputes, and myriad instances too numerous to list"). We therefore indicated that "circumstances short of a perceived emergency may justify a warrantless entry[,]" and the appropriate inquiry is: "Given the known facts, would a prudent and reasonable officer have perceived a need to act in the proper discharge of his or her community caretaking functions?" *Id.* ¶ 46, 775 N.W.2d at 241 (quoting *People v. Ray*, 981 P.2d 928, 937 (Cal. 1999)).

[¶31.] Importantly, our analysis in *Deneui* did not clearly establish the contours of the exception such that, under the circumstances of this case, a reasonable officer would have understood that what he or she was doing would not fit the community caretaker exception. In fact, in *Deneui*, we quoted Professor LaFave for the proposition that "[d]oubtless there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable." *Id.* ¶ 49, 775 N.W.2d at 242 (quoting 3 Wayne R. LaFave, *A Treatise on the Fourth*

*Amendment*, 3 Search & Seizure § 6.6, p. 396–400 (3d ed. 1996)). Finally, even if the officers were mistaken in believing they had a sufficient basis to enter Nichole's apartment without her permission, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *See Saucier v. Katz*, 533 U.S. 194, 205, 121 S. Ct. 2151, 2158, 150 L. Ed. 2d 272 (2001).

[¶32.] Because the officers' warrantless entry into Nichole's apartment under the circumstances presented was not clearly unlawful in light of existing precedent, the circuit court erred in denying the defendants' motion for summary judgment as to this constitutional claim.

### *Excessive Use of Force in Detaining Nichole*

[¶33.] In *Yellowback v. City of Sioux Falls*, we explained "that all claims that law enforcement officers have used excessive force must be analyzed under the Fourth Amendment's guarantee to citizens of the right 'to be secure in their persons . . . against unreasonable . . . seizures.'" 1999 S.D. 114, ¶ 9, 600 N.W.2d 554, 557 (quoting *Darrow v. Schumacher*, 495 N.W.2d 511, 519 (S.D. 1993)). Whether a constitutional violation has occurred depends upon "whether the officer's actions were 'objectively reasonable' in light of the facts and circumstances confronting him." *Id.* ¶ 10, 600 N.W.2d at 558 (citation omitted). Objective reasonableness under the circumstances is viewed "from the perspective of the officer at the scene" and not "with the '20/20 vision of hindsight.'" *Id.* ¶ 11 (emphasis omitted) (citation omitted). Further, the United States Supreme Court has instructed that "[d]etermining whether the force used to effect a particular seizure is 'reasonable'

under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989) (additional internal quotation marks omitted) (citation omitted). In this regard, courts are to give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S. Ct. at 1872.

[¶34.]     Here, given the disparate accounts by the parties as to what transpired when the officers made physical contact with Nichole, the circuit court correctly determined there are material issues of fact in dispute on the question whether the officers' use of force was objectively reasonable under the circumstances.[2] The court was also correct in determining that when the facts are viewed in a light most favorable to Nichole, a jury could conclude that the officers used excessive force. Viewing the facts in this light, there is no evidence suggesting that Nichole posed a

---

2.     The defendants cite *Scott v. Harris*, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 1776 n.8, 167 L. Ed. 2d 686 (2007), which held that the reasonableness of an officer's actions is, at the summary judgment stage, *a question of law*, and then claim that "[t]his Court's contrary statement in *Thornton*" is wrong. Recently, in *Hamen v. Hamlin County*, we overruled the statement in *Thornton* that "the objective reasonableness of the officer's actions under the first prong of the qualified immunity analysis, which determines whether a constitutional violation has occurred, is a jury question." 2021 S.D. 7, ¶ 45 n.10, 955 N.W.2d 336, 352 n.10 (quoting *Thornton*, 2005 S.D. 15, ¶ 13, 692 N.W.2d at 531). Therefore, whether an officer's actions were objectively reasonable is a question of law, and here, we assess as a matter of law whether the officers' conduct was objectively reasonable after accepting and applying Nichole's alleged facts.

threat to the officers or that she physically resisted. Not only was she much smaller in stature compared to the two officers, the officers allowed her to roam unrestrained, including two trips to her garage, in the twenty minutes before they entered her apartment. Finally, Nichole was unarmed, nonviolent, and only *after* the physical contact with the officers, was she alleged to have committed a misdemeanor offense.

[¶35.] Although the facts with respect to the nature of the physical contact are disputed, Nichole maintains that she simply followed Officer Toland into her apartment while looking through her papers describing her constitutional rights when, *without verbal warning*, Officer Pearson grabbed her arm and threw her to the ground causing her to faceplant on the entryway floor. *See Thornton*, 2005 S.D. 15, ¶ 14, 692 N.W.2d at 532 (declining to find qualified immunity as a matter of law when the facts viewed in plaintiff's favor established that officers "violently tackl[ed] the walking man from behind without warning"). She also claims that the injuries she suffered from this use of force included a fractured radius and a dislocated shoulder. Accepting Nichole's facts as true, neither the severity of her alleged crime nor her conduct justified the nature and quality of the force used. *See Bauer v. Norris*, 713 F.2d 408, 413 (8th Cir. 1983) (concluding that the use of force in arresting the suspects was excessive even though they were "argumentative, vituperative, and threatened legal action" because there was no evidence of physical resistance or physical threats).

[¶36.] The defendants further claim, however, that even if Nichole "can satisfy the first prong of the qualified immunity analysis, the officers are still

entitled to qualified immunity because it was not clearly established that their actions were unlawful." As support, they direct this Court to *Kelsay v. Ernst*, 933 F.3d 975 (8th Cir. 2019), *Ehlers v. City of Rapid City*, 846 F.3d 1002 (8th Cir. 2017), *Rudley v. Little Rock Police Department*, 935 F.3d 651 (8th Cir. 2019), and *Emmons v. City of Escondido*, 921 F.3d 1172 (9th Cir. 2019). According to the defendants, the above cases support that "[i]t was not clearly established in August 2016 that an officer was forbidden to take [] down a suspect who repeatedly ignored and defied his commands and then physically interfered with the officers' attempts to enter the apartment to conduct a health and wellness check."

[¶37.]     Aside from the fact that the cases cited by the defendants were decided *after* the incident in question and cannot, therefore, be relied upon as clearly established law governing the officers' actions here, the problem with the defendants' argument is their characterization of the facts. They simply ignore the dictate that in deciding, on summary judgment, whether the law was clearly established such that any reasonable officer would understand that what he or she is doing is unlawful, we must accept the facts as alleged by the nonmoving party.[3] When the facts are viewed in Nichole's favor, the body of case law existing on

---

3.     There is a dispute as to whether Nichole disobeyed a command when she entered her apartment. Officer Pearson claims he instructed her to wait outside, and Officer Toland's affidavit states that he heard Officer Pearson say this. The defendants' statement of undisputed material facts includes a statement from Sergeant Hoffman's affidavit that "the officers told Ms. Boggs that she was not allowed to enter the apartment while they performed the search." However, Nichole denied this statement, and also points out in her own statement of undisputed material facts that the police department's policy on 911 calls does not prohibit residents from being present when searches are conducted.

August 19, 2016, would put reasonable officers on sufficient notice that they could not forcefully take to the ground a non-felony suspect who did not pose a threat to anyone or physically resist an officer's command.

[¶38.]     "The Fourth Amendment's prohibition against unreasonable searches and seizures clearly established the right to be free from excessive force in the context of an arrest." *Johnson v. Carroll*, 658 F.3d 819, 827 (8th Cir. 2011). The Eighth Circuit Court of Appeals has further explained that "it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Id.* (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009)); *accord Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013) ("It was unreasonable for McCrystal to use more than de minimis force against Small by running and tackling him from behind without warning."). We concluded the same in *Thornton*, explaining "that reasonable officers would know without specific guidance from the courts that tackling a non-felony suspect to the ground from behind where no exigent circumstances exist without first giving him an opportunity to surrender peacefully is unconstitutional." 2005 S.D. 15, ¶ 20, 692 N.W.2d at 535. Because the evidence viewed in a light most favorable to Nichole supports that the officers violated her constitutional right to be free from excessive force and that such right was clearly established at the time of the officers'

misconduct, the circuit court properly denied the defendants' summary judgment motion as to the excessive force claim.[4]

### The City's Liability under § 1983

[¶39.]     The defendants claim the circuit court erred in denying summary judgment on Nichole's claim against the City because, in their view, no evidence exists to suggest the City created, adopted, or supported a policy or custom that was the moving force behind Nichole's alleged injury.  In response, Nichole asserts that the police department's inadequate training on when and to what extent force may be used amounted to a deliberate indifference to the rights of citizens and contributed to her injury and the constitutional violation.  She also contends that Sergeant Hoffman was inadequately trained on how to conduct an investigation, and thus, the City could be held liable.  Finally, she asserts that liability attaches against the City because Sergeant Hoffman is a policymaker and he ratified the officers' use of force against her.

[¶40.]     "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury."  *Connick v. Thompson*, 563 U.S. 51, 60, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d

---

4.     In its memorandum opinion, the circuit court separately determined Sergeant Hoffman was not entitled to qualified immunity as a matter of law as the supervising officer, applying the analysis from *Hart v. Miller*, 2000 S.D. 53, ¶ 33, 609 N.W.2d 138, 147–48.  The defendants did not seek review of this ruling in their petition for intermediate appeal, which challenged only the court's rulings related to the officers' unlawful entry and use of force and the vicarious liability of the City.  Further, the defendants' qualified immunity arguments do not differentiate between the sergeant and the two officers.  Therefore, in keeping within the confines of the issues on which we granted an intermediate appeal, we decline to separately address the court's denial of summary judgment as it relates to Sergeant Hoffman.

417 (2011) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978)). The Court further explained that "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* at 61, 131 S. Ct. at 1359. When a claim hinges on a failure to train, the "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (alteration in original) (citation omitted). This is because a policy of inadequate training "is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985). Therefore, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Id.* at 823–24, 105 S. Ct. at 2436. Or when the "policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.*

[¶41.] Here, Nichole does not allege that the police department's policies are themselves unconstitutional. She likewise does not allege or identify evidence in the record to support her conclusory statement that in training its employees, the

City acted with a deliberate indifference to the rights of citizens. In particular, Nichole does not point to any evidence of a continuing, widespread, persistent pattern of unconstitutional conduct by Sioux Falls police officers. *See Connick*, 563 U.S. at 62, 131 S. Ct. at 1360 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (citation omitted)). The circuit court's reliance on the mere presence of 17 police officers on the scene, including a sergeant, who, in the court's view, witnessed or participated without objection, was insufficient to support its denial of summary judgment in favor of the City. Finally, even if Nichole is correct that Sergeant Hoffman is a policymaker as the term is used in holding municipalities liable under § 1983,[5] she has not identified how the sergeant's investigation and ratification of the other officers' use of force *after* the incident *caused* her claimed injuries. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405, 117 S. Ct. 1382, 1389, 137 L. Ed. 2d 626 (1997) ("To the extent that we have recognized a cause of action under § 1983 based on a single

---

5. Nichole does not claim that Sergeant Hoffman has final policymaking authority on the amount of force officers are authorized to use. On the contrary, the policy governing officer use of force is set by the department. At most, then, Sergeant Hoffman has been delegated authority to determine after the fact—under the police department's policy—whether the use of force in a given scenario was reasonable. But such delegated authority alone is not sufficient to support a conclusion that Sergeant Hoffman is the final policymaker under these circumstances. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82, 106 S. Ct. 1292, 1299, 89 L. Ed. 2d 452 (1986) ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing the final government policy respecting such activity before the municipality can be held liable." (internal citation omitted)).

decision attributable to a municipality, we have done so only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation."). The circuit court erred in denying the City summary judgment.

### *Plaintiff's Request for Appellate Attorney Fees*

[¶42.]        Nichole requests $9,438.83 in appellate attorney fees and taxes. She relies on 42 U.S.C. § 1988(b), which provides that "[i]n any action . . . to enforce a provision of sections . . . 1983 . . . of this title . . . the court, in its discretion, may allow the prevailing party, . . . a reasonable attorney's fee as part of the costs[.]" Because Nichole cannot be said to have prevailed in her action enforcing the provisions of § 1983, we are not authorized to award the appellate attorney fees she requests. In explaining what is meant by *prevailed* under § 1988, the United States Supreme Court said that "it seems clearly to have been the intent of Congress to permit such an interlocutory award only to a party who has established his entitlement to some relief on the *merits* of his claims, either in the trial court or on appeal." *Hanrahan v. Hampton*, 446 U.S. 754, 757, 100 S. Ct. 1987, 1989, 64 L. Ed. 2d 670 (1980) (emphasis added).

[¶43.]        Nichole has not yet established entitlement to some relief on the merits of her claims. Rather, she has established only that she is entitled to a trial on the merits for at least one claim. Therefore, Nichole's request for appellate attorney fees is premature. "As a practical matter [Nichole is] in a position no different from that [she] would have occupied if [she] had simply defeated the defendants' motion for a directed verdict in the trial court. The jury may or may not

decide some or all of the issues in favor of the respondents." *See id.* at 758–59, 100 S. Ct. at 1990.

## Conclusion

[¶44.] The circuit court erred in denying summary judgment on Nichole's § 1983 claim that the officers' warrantless entry into her apartment violated her constitutional right to be free from unreasonable searches and seizures. The circuit court also erred in denying the City's motion for summary judgment. However, the court properly concluded that material issues of fact are in dispute on the question whether the officers used excessive force such that the defendants are not entitled to qualified immunity as a matter of law on this § 1983 claim.

[¶45.] Affirmed in part, reversed in part, and remanded.

[¶46.] JENSEN, Chief Justice, and KERN and SALTER, Justices, and GILBERTSON, Retired Chief Justice, concur.

[¶47.] MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.