#29485-a-PJD
**2022 S.D. 10**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellant,

   v.

DANIEL JAMES GRASSROPE,                    Defendant and Appellee.

* * * *

APPEAL FROM THE MAGISTRATE COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ANDREW ROBERTSON
Judge

* * * *

DANIEL HAGGAR
DREW DEGROOT
NICHOLAUS MICHELS
Minnehaha County Deputy
   State's Attorneys
Sioux Falls, South Dakota                    Attorneys for plaintiff and
                               appellant.


CHRISTOPHER MILES of
Minnehaha County Public
   Defender's Office
Sioux Falls, South Dakota                    Attorneys for defendant and
                               appellee.

* * * *

ARGUED
OCTOBER 5, 2021
OPINION FILED **02/09/22**

#29485

DEVANEY, Justice

[¶1.]      The State appeals the magistrate court's decision granting Daniel Grassrope's motion to suppress, asserting that the magistrate court erred in determining that the community caretaker exception to the Fourth Amendment did not apply.

### Factual and Procedural Background

[¶2.]      In the early morning of March 7, 2020, Sioux Falls dispatch received a call from a six-year-old boy.  In the initial call, the child gave the phone to his mother, and when dispatch asked the mother if there was an emergency, she hung up the phone.  When dispatch called back, the child answered and said that "daddy was being mean to mom."  The child also informed dispatch that his dad was leaving to go to his car.  Dispatch relayed the information shortly thereafter to Officer Conley at 2:46 a.m.

[¶3.]      Officer Conley, believing a domestic dispute might be occurring, responded to the apartment building from which the call had been placed.  On his way to the apartment, dispatch further advised that according to the child, "dad was talking back and mom didn't like it."  Officer Conley arrived at the apartment building at 2:48 a.m. and saw a tan Chevy Malibu leaving the parking lot.  At this time, he had not yet received information describing the father's car.  Officer Conley testified that he decided to follow the Malibu because he had very limited information and was not sure if the driver was a victim or the suspect, or if someone had been hurt.

[¶4.] Shortly thereafter, dispatch provided an update stating that the father's automobile was silver. Officer Conley initiated a traffic stop at 2:49 a.m., and Daniel Grassrope was the only person in the automobile. Officer Conley testified that while speaking to Grassrope, he immediately detected a strong odor of intoxicants. After further investigation, he placed Grassrope under arrest for driving under the influence (DUI) and driving with a suspended license.

[¶5.] Before trial, Grassrope filed a motion to suppress all evidence obtained during the stop. Grassrope claimed that Officer Conley violated his Fourth Amendment right against unreasonable search and seizure by stopping his automobile without probable cause or a reasonable and articulable suspicion. In response, the State asserted that Officer Conley had an objectively reasonable suspicion that Grassrope had engaged in criminal activity, but the State primarily argued that Officer Conley's actions were lawful under the community caretaker doctrine.

[¶6.] The magistrate court issued findings of fact and conclusions of law granting Grassrope's motion to suppress. The magistrate court found that Officer Conley did not observe any traffic violations and that his decision to stop Grassrope's vehicle was based solely on the information provided by dispatch regarding a family dispute. The court further found that the information from dispatch did not indicate that a crime had been committed, there had been no request for help, and there was no indication that the mother or child had left the apartment. Instead, the child reported that the father had left. The magistrate

court therefore concluded that the community caretaker exception did not apply.[1] The State appeals the magistrate court's order granting Grassrope's motion to suppress, alleging the court erred in determining that the community caretaker exception did not apply to the circumstances surrounding Officer Conley's stop.

## Standard of Review

[¶7.]     "We review the [magistrate] court's grant or denial of a motion to suppress involving an alleged violation of a constitutionally protected right under the de novo standard of review." *State v. Short Bull*, 2019 S.D. 28, ¶ 10, 928 N.W.2d 473, 476 (quoting *State v. Kleven*, 2016 S.D. 80, ¶ 7, 887 N.W.2d 740, 742). "The court's findings of fact are reviewed under the clearly erroneous standard, but we give no deference to the court's conclusions of law." *State v. Fischer*, 2016 S.D. 12, ¶ 10, 875 N.W.2d 40, 44 (quoting *State v. Fierro*, 2014 S.D. 62, ¶ 12, 853 N.W.2d 235, 239). "[O]nce those facts have been determined, 'the application of a legal standard to those facts is a question of law reviewed de novo.'" *State v. Heney*, 2013 S.D. 77, ¶ 8, 839 N.W.2d 558, 561–62 (quoting *State v. Hess*, 2004 S.D. 60, ¶ 9, 680 N.W.2d 314, 319). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum*

---

1.     It appears from the magistrate court's comments during its oral ruling and from some of the court's written factual findings that the court also rejected the State's alternative argument that Officer Conley had reasonable suspicion to believe the driver of the vehicle had engaged in criminal activity. However, the court did not enter a written conclusion stating that the evidence did not meet the reasonable suspicion standard to justify the stop of Grassrope's vehicle to further investigate a crime. In any event, the State is not pursuing this alternative argument on appeal.

*Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746 (1948) (internal quotation marks omitted).

## Analysis and Decision

[¶8.]     The Fourth Amendment to the United States Constitution and Article VI, section 11, of the South Dakota Constitution guarantee a person's right to be free from unreasonable searches and seizures.  "[T]he Fourth Amendment's textual reference to the issuance of '[w]arrants' has been interpreted to state a general principle that police officers 'must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure[.]'" *State v. Schumacher*, 2021 S.D. 16, ¶ 20, 956 N.W.2d 427, 432 (quoting *Short Bull*, 2019 S.D. 28, ¶ 11, 928 N.W.2d at 476).  However, courts have long recognized certain exceptions to the warrant requirement.  "[A] warrant is not required to effect a temporary seizure of a vehicle by means of a traffic stop." *Short Bull*, 2019 S.D. 28, ¶ 12, 928 N.W.2d at 476 (citing *State v. Bowers*, 2018 S.D. 50, ¶ 10, 915 N.W.2d 161, 164).  A police officer need only have "a reasonable suspicion to stop a vehicle." *Id.* (quoting *State v. Chavez*, 2003 S.D. 93, ¶ 15, 668 N.W.2d 89, 95).  "While the stop may not be the product of mere whim, caprice or idle curiosity, it is enough that the stop is based upon 'specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'" *Id.* (quoting *Chavez*, 2003 S.D. 93, ¶ 16, 668 N.W.2d at 95).  The State carries the burden to prove that the search or seizure falls within an exception to the warrant requirement. *State v. Edwards*, 2014 S.D. 63, ¶ 12, 853 N.W.2d 246, 251 (citing *Hess*, 2004 S.D. 60, ¶ 23, 680 N.W.2d at 324).

[¶9.]     We have recognized that the "specific and articulable facts standard . . . has not been exclusively connected with the detection of criminal activity." *Short Bull*, 2019 S.D. 28, ¶ 13, 928 N.W.2d at 476.  We have likewise applied this standard when police officers act as community caretakers, noting that "[f]rom first responders to the sick and injured, to interveners in domestic disputes, and myriad instances too numerous to list, police officers fulfill a vital role where no other government official can."  *Id.* ¶ 14, 928 N.W.2d at 477 (quoting *State v. Deneui*, 2009 S.D. 99, ¶ 49, 775 N.W.2d 221, 242).  Our prior cases applying what came to be known as the "community caretaker exception" stem from the United States Supreme Court's recognition that local law enforcement officers often "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528, 37 L. Ed. 2d 706 (1973) (determining that a warrantless search for a firearm believed to be in a disabled vehicle that had been towed from a public highway after an accident did not violate the Fourth Amendment).

[¶10.]     We first applied the community caretaker exception in *State v. Rinehart* and acknowledged that law enforcement officers, under appropriate circumstances, "may be justified in stopping a vehicle to provide assistance, without needing any reasonable basis to suspect criminal activity."  2000 S.D. 135, ¶ 7, 617 N.W.2d 842, 843 (citation omitted).  However, we recognized that the exception should be applied "cautiously and narrowly" to avoid the risk of abuse or the use of

the exception "as a pretext for conducting an investigatory search for criminal evidence." *Id.* ¶ 10, 617 N.W.2d at 844 (quoting *Commonwealth v. Waters*, 456 S.E.2d 527, 530 (Va. Ct. App. 1995)). Thus far, we have applied the community caretaker exception in three instances involving the warrantless search or temporary seizure of an automobile.

[¶11.] In *Rinehart*, we held that a law enforcement officer, acting in his role as a community caretaker, was authorized to stop an automobile after he observed the vehicle traveling at an "excessively slow speed" and believed it was being driven by someone experiencing either a "medical emergency or automotive malfunction[.]" *Id.* ¶¶ 8–9, 617 N.W.2d at 844. We concluded, based on the circumstances of the case, that the officer was justified "in stopping Rinehart to make sure everything was all right." *Id.* ¶ 11, 617 N.W.2d at 844.

[¶12.] We have also held a police officer's actions were justified under the community caretaker exception when the officer knocked on the driver's window of an automobile that had been parked at the same location with the engine running for an extended period of time during the early morning hours and the driver appeared to either be sleeping or passed out. *Kleven*, 2016 S.D. 80, ¶ 12, 887 N.W.2d 740, 743. We determined that the officer had "sufficient reasons to act" under the circumstances. *Id.*

[¶13.] Finally, in *Short Bull*, we concluded an officer had reasonable facts to initiate a stop of a vehicle suspected to be occupied by the victim of a possible domestic disturbance. 2019 S.D. 28, ¶ 21, 928 N.W.2d at 478. While the facts in *Short Bull* have some similarities to the facts underlying the stop of Grassrope's

vehicle, there are notable distinctions that bear directly upon the dichotomy between police officers' caretaking and law enforcement roles. In *Short Bull*, at approximately 3:00 a.m., a hotel night clerk called dispatch and reported that she had received a call from a female patron asking for help. *Id.* ¶ 2, 928 N.W.2d at 474. Shortly after the initial call, the clerk spoke to dispatch again, reporting that the female patron was in the lobby. According to the clerk, the female had confirmed she was involved in a domestic dispute and that the male was still in the hotel room. The woman then left the hotel. *Id.* An officer responded to the call, and upon arrival at the hotel, dispatch advised that the female was in the parking lot but did not provide a description of the vehicle or a direction of travel. *Id.* ¶ 3, 928 N.W.2d at 474. The officer did not see any pedestrians or traffic movement in front of the hotel, but as he pulled around to the rear parking lot, he saw a black SUV leaving the lot and activated his lights and siren to stop the vehicle. *Id.* Under the circumstances, the Court concluded that the officer's actions fell within the community caretaker exception because he had reasonable and articulable facts to initiate the stop.[2]

---

2. Although, since *Rinehart*, we have applied the community caretaker exception in circumstances involving warrantless entries of both vehicles and residences, we recently noted in *Boggs v. Pearson*, 2021 S.D. 44, ¶ 25, 963 N.W.2d 304, 312–13, that the United States Supreme Court has now clarified that its previous acknowledgement of law enforcement's caretaking duties did not create "a standalone doctrine that justifies warrantless searches and seizures *in the home.*" *Caniglia v. Strom*, ___ U.S. ___, 141 S. Ct. 1596, 1598, 209 L. Ed. 2d 604 (2021) (emphasis added). The United States Supreme Court nevertheless reaffirmed its existing precedent recognizing that law enforcement may enter private property "when certain exigent circumstances exist, including the need to 'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Id.* at ___, 141 S.

(continued . . .)

[¶14.]	Here, however, Officer Conley never received information suggesting that a person in need of aid was leaving the apartment. The only information he possessed was the child's report that his father was "being mean" to his mother and "talking back" to her and that his father had gone to his car. Even if the information from dispatch would have supported a decision to seek entrance to the caller's apartment to ensure that everyone was safe, there was no additional caretaking concern that justified a stop of the father's vehicle as it was driving away. Officer Conley's claim that he was concerned the driver of the vehicle leaving the apartment might have been the victim of a domestic assault is not supported by the reported information. As a result, Officer Conley could not articulate specific facts to support his contention that he stopped Grassrope's vehicle in the exercise of his community caretaking role.

[¶15.]	We acknowledge that officers responding to reports of domestic disturbances must often make on-the-spot, difficult decisions regarding how to ensure the safety of persons involved. But when relying upon the community caretaking exception to justify a warrantless search or seizure, they must nevertheless operate within the bounds of our existing precedent directing that this exception be applied cautiously and narrowly. Applying this directive here, Officer

---

(. . . continued)

Ct. at 1599 (quoting *Kentucky v. King*, 563 U.S. 452, 460, 470, 131 S. Ct. 1849, 1856, 179 L. Ed. 2d 865 (2011)). Three separate concurring opinions in *Caniglia* emphasized that the principles underlying *Cady's* recognition of law enforcement's community caretaking functions are still sound. *Id.* ___, 141 S. Ct. at 1600–04.

Conley's actions were beyond the scope of a community caretaker. Therefore, the magistrate court properly granted Grassrope's motion to suppress.

[¶16.]     Affirmed.

[¶17.]     JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.